**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Andrew GEORGE et al., Defendants-Appellants.**

**Nos. 72-1553 to 72-1555.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1973.

Decided April 12, 1973.

Rehearing and Rehearing En Banc Denied May 2, May 31 and June 5, 1973.

---

44. Section 4332, 42 U.S.C.

Charles A. Bellows, Sherman C. Magidson, Michael B. Nash, Francis X. Riley, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Glynna W. Freeman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

The three defendants were indicted for mail fraud in violation of 18 U.S.C. § 1341 and for aiding and abetting that fraud under 18 U.S.C. § 2. The indictment was ultimately in 18 counts.[1] The only variance in counts was that the last 17 involved additional mailing dates.

The indictment described defendant Peter K. Yonan as a cabinet buyer in

1. The original Count 18 was dismissed and Count 19 became Count 18 prior to submission of the case to the jury.

the Purchasing Department of Zenith Radio Corporation. Defendant Andrew George was said to do business as A & G Woodworking Co. The other defendant, Irving H. Greensphan, was specified as president of Accurate Box Corporation, which supplied cabinets to Zenith.

The grand jury charged that from June 1967 through January 1971, the three friends devised a scheme to defraud Zenith whereby Yonan received kickbacks on Accurate Box Corporation's sales of cabinets to Zenith. To accomplish this, George allegedly submitted fictitious "commission" invoices of A & G Woodworking Co. to Greensphan's company. After these invoices were paid, George supposedly paid part of the proceeds to Yonan. The kickbacks were of course not disclosed to Zenith. The indictment alleged that the scheme deprived Zenith of its lawful money and property and of the honest and faithful performance of its employee Yonan's duties. The mailings mentioned in the indictment covered checks sent by Zenith to Greensphan's cabinet company before the latter was billed by George's company.

After a jury trial, the defendants were found guilty as charged. Yonan received a three-year sentence; George received a one-year sentence and was assessed a $1,000 fine on each count; and Greensphan received a six-month sentence and was ordered to pay a $1,000 fine on each count. On appeal, all defendants assert that the evidence was insufficient to convict them of mail fraud; George and Greensphan assail instructions; George complains of the court's receipt into evidence of Zenith's conflict-of-interest policy; and Yonan attacks the court's refusal to sever his trial from Greensphan's. We affirm.

The evidence brought forward at the trial disclosed a novel scheme. Yonan went to work for Zenith in 1961 and was a buyer in the cabinet division of Zenith's Purchasing Department. He had "primary responsibility" for negotiating with cabinet vendors, and, in the words of his immediate supervisor, that meant

"his responsibility was to send out the blueprints and gather in quotations, and where the price was too high, to try to negotiate it down to a proper level." Of course, the quotations Yonan negotiated were reviewed by his superiors and by other departments of Zenith. In 1966, Yonan was given the responsibility for finding and negotiating with a supplier of cabinets for Zenith's newly conceived "Circle of Sound" product. His responsibility also included arranging for delivery and monitoring the quality of the cabinets. His friend since the mid-fifties, defendant Greensphan, the owner of Accurate Box Corporation ("Accurate"), was tapped as the supplier. During the indictment years, Accurate was the sole bidder on and supplier of these cabinets. Yonan's supervisor thought Accurate's prices to be fair and reasonable, but in the absence of other bidders, could not conclude they were competitive. Zenith normally allowed its suppliers a maximum of 10% profit, and Accurate's prices reflected that profit margin. The Circle of Sound product proved to be a tremendous financial success. The Zenith checks listed in the indictment were received by Accurate in payment of the cabinets sold to Zenith.

Without recounting any actual threat by Yonan, Greensphan testified that he agreed to pay Yonan $1 per cabinet kickback on the model 565 Circle of Sound unit and later per cabinet kickbacks on other models because he was afraid he was otherwise going to lose Zenith's business. Yonan assertedly told him that "everybody and their uncle would like to get into this to manufacture this unit." He stated that Yonan's requests for such payments originated in October 1967. When he asked Yonan how the kickbacks were to be paid, Greensphan was told to pay A & G Woodworking Co.'s commission invoices. Greensphan never related these events to anyone at Zenith. He had known defendant George since 1960. He denied inflating any quotations to cover monies paid to Yonan.

Commencing in December 1967, Accurate received commission invoices from defendant George's A & G Woodworking Co. even though neither George nor A & G Woodworking Co. provided any services to Accurate. Accurate paid these invoices on the basis of a commission per unit on the types of models it shipped to Zenith.[2] Greensphan also cashed a $3,000 Accurate check payable to himself and gave the proceeds to George because he was fearful of losing Zenith's business. To conceal the set fee per unit commission on the cabinets shipped, Accurate's records showed the payments to George's company as 3.4% on monies Accurate received from Zenith rather than as fixed sums on each cabinet. However, on these records the total prices of the cabinets shipped to Zenith were not correct, but were altered to make the commissions correspond to 3.4% thereof. From December 1967 until December 1970, Accurate paid George's company in excess of $300,000 in commissions. During the period in which Greensphan's company was paying the commission invoices of George's company, the latter paid Yonan kickbacks in excess of $100,000 through checks made out by George.

The Government's theory, credited by the jury, was that the kickbacks to Yonan were accomplished by Greensphan's payments of George's company's fictitious commission invoices, with George then acting as a kickback conduit to Yonan. In this connection, it should be noted that in 1969 or 1970, Yonan asked Greensphan's company's controller for a report of the total commission payments then made by that company to George. Shipping quantities on at least one A & G invoice were confirmed to Yonan by Accurate's plant superintendent.

Zenith had a conflict-of-interest policy providing that no gratuities of any nature were to be bestowed on its Purchasing Department employees by suppliers. Yonan twice signed documents embodying that policy, which was annually brought to the attention of all suppliers of Zenith through letters sent out to them. Greensphan admitted receiving these letters during the period of time he was channeling the payments to Yonan.

A number of Zenith's employees testified that Yonan did not request preferential treatment for Greensphan and his company and that they had no knowledge of Yonan providing such treatment for them. It appears Yonan was insistent on quality and efficiency from Accurate.

*Evidentiary Sufficiency of a Scheme to Defraud*

The mail fraud statute[3] delineates two essential elements constituting the crime: a scheme to defraud and use of the mails in furtherance of the scheme. There is no dispute as to the sufficiency of the evidence to establish use of the mails, nor could there be. Defendants contend that the evidence was insuffi-

2. On two Circle of Sound models, the commission was $1.00 per unit shipped, and on two others it was $.75 and $.20 per unit respectively.

3. 18 U.S.C.A. § 1341 provides:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

cient to satisfy the first element—the existence of a scheme to defraud. Reduced to its essential distillation, their argument is that because the kickbacks were never shown to come out of Zenith's pockets, as opposed to Greensphan's, because Yonan was never shown to provide or secure any special services for Greensphan and his company, and because Zenith was never shown to be dissatisfied with Accurate's cabinets or prices, no fraud within the contemplation of the statute can have occurred. We reject this argument, in part because it misses the point in two respects and in part because the particular scheme shown by the evidence to defraud Zenith is, from every defendant's point of view, within the reach of the mail fraud statute.

■■ Since the gravamen of the offense is a "scheme to defraud," it is unnecessary that the Government allege or prove that the victim of the scheme was actually defrauded or suffered a loss. United States v. Regent Office Supply Co., 421 F.2d 1174, 1180–1181 (2d Cir. 1970); Pritchard v. United States, 386 F.2d 760, 766 (8th Cir. 1967); Adjmi v. United States, 346 F.2d 654, 657 (5th Cir. 1965); United States v. Shavin, 287 F.2d 647, 651–652 (7th Cir. 1961), certiorari denied, 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273. If there was intent on the part of a schemer to deprive Zenith of Yonan's honest and loyal services in the form of his giving Greensphan preferential treatment, it is simply beside the point that Yonan may not have had to (or had occasion to) exert special influence in favor of Greensphan or that Zenith was satisfied with Accurate's product and prices. And it is of

no moment whether or not the kickback money actually came from Zenith. United States v. Dorfman, 335 F.Supp. 675, 679 (S.D.N.Y.1971). Thus the district court correctly charged the jury that it was unnecessary for the Government to prove "that anyone actually be defrauded." Contrary to defendants' contentions, the evidence hardly shows that it was impossible for Yonan to exercise favoritism toward Greensphan. As the Court noted in Shushan v. United States, 117 F.2d 110, 115 (5th Cir. 1941), certiorari denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531: "The fact that the official who is bribed is only one of several and could not award the contract by himself does not change the character of the scheme where he is expected to have influence enough to secure the end in view." In our view the evidence shows that Yonan did have opportunities to give Greensphan preferential treatment, particularly by avoiding the solicitation of potential competitors. Of course, the actual exercise of any such opportunity by a person in Yonan's position may be practically undetectable.

■■ Furthermore, even if Yonan never intended to give Greensphan preferential treatment, and the Government does not argue that the evidence was sufficient to support a conclusion that he did, the defendants' argument still misses the mark. The evidence shows Yonan actually defrauded Zenith. We need not accept the Government's far-ranging argument that anytime an agent secretly profits from his agency he has committed criminal fraud.[4] Not every breach of every fiduciary duty works a criminal fraud.[5] But here Yon-

---

4. See United States v. Faser, 303 F.Supp. 380, 383–384 (E.D.La.1969); United States v. Hoffa, 205 F.Supp. 710, 716 (S.D.Fla.1962).

5. See Epstein v. United States, 174 F.2d 754 (6th Cir. 1949). In that case, heavily relied on by defendants, two of the defendants had directorates in both breweries and brewery supply companies, and the Government argued that because the

breweries bought from these suppliers and the defendants did not disclose their conflict-of-interest positions, the defendants were guilty of mail fraud. The Court held such conduct was "constructive" and not "active" fraud and outside the purview of the mail fraud statute absent a showing that the supply companies' prices were unfair. Its rationale was that under applicable civil law, directors, on behalf of their corporations, could con-

an's duty was to negotiate the best price possible for Zenith or at least to apprise Zenith that Greensphan was willing to sell his cabinets for substantially less money. Not only did Yonan secretly earn a profit from his agency, but also he deprived Zenith of material knowledge that Greensphan would accept less profit. There was a very real and tangible harm to Zenith in losing the discount or losing the opportunity to bargain with a most relevant fact before it. As Judge Learned Hand stated in a related context:

"A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed." United States v. Rowe, 56 F.2d 747, 749 (2d Cir. 1932), certiorari denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289.

Here the fraud consisted in Yonan's holding himself out to be a loyal employee, acting in Zenith's best interests, but actually not giving his honest and faithful services, to Zenith's real detriment.

No refuge can be taken in Zenith's policy "normally" to allow suppliers a 10% profit and in Accurate's prices being within that margin. Nothing

would have prevented Zenith from bargaining with Accurate for a lesser profit margin, and it would be unrealistic to presume that Zenith would consider the fact of better than $100,000 in actual kickbacks to its buyer—over $300,000 in agreed-to-kickbacks—to be immaterial in its dealings with Greensphan. It is preposterous to claim that Zenith would have spurned such a discount if offered.

In this case, whether Zenith was to be deprived of Yonan's honest and faithful performance of his duties to the extent of his secretly profiting from his agency and concealing knowledge of the availability of that material sum from Zenith, or to the further extent of his meriting the payments which he received, a fraud within the reach of the mail fraud statute would be present.[6] The statute requires the existence of a scheme to perpetrate this fraud, and the question of evidentiary sufficiency boils down to whether the Government has proven that the defendants contemplated that Zenith suffer the loss of Yonan's honest and loyal services.

Indubitably the evidence showed a "scheme." The critical element is fraudulent intent. United States v. Regent Office Supply Co., *supra*, 421 F.2d at 1180. Each of the defendants asserts that there was insufficient evidence as to his intent to defraud Zenith of Yonan's loyalty and honesty, but we conclude to the contrary.

■■ As to Yonan, his undisclosed receipt of the kickbacks by itself war-

---

tract with themselves or corporations in which they were interested, and such contracts were completely valid so long as they were advantageous and made in good faith. Under these circumstances mere non-disclosure did not generate a profit at the corporation's expense. However, those defendants did not have a duty to make their profit—the return on their investment in the supply companies—available to the breweries, whereas Yonan did have a duty to make his profit—an assumedly unmerited kickback—available to Zenith. There was no reason to believe disclosure by the defendants in *Epstein* would have, under the particular circumstances there, made any bargaining

difference to the breweries, but Yonan's disclosure, in addition to making the scheme impossible, would have enabled Zenith to realize a substantial discount.

6. The court properly charged the jury as follows:
"Now, to knowingly tamper or interfere with an employer-employee relationship for the purpose of and with the intent of depriving the employer of the employee's honest and faithful performance of his duties for the employer may constitute a fraud within the meaning of the mail fraud statute." See United States v. Procter & Gamble Co., 47 F.Supp. 676, 678 (D.Mass.1942).

rants a finding that he intended to defraud Zenith of his honest and loyal services. His employment duty was to negotiate the best possible deal for Zenith, or at least to apprise Zenith that Greensphan would be satisfied with a lesser profit margin. He is presumed to know that he could not personally profit by any decrease in price he could negotiate with Greensphan [7] and that any such decrease should be made available to Zenith. In sum, the jury could hardly help but infer that Yonan intended to do exactly what he did. Hence it was not necessary for the jury to conclude that when Yonan received the kickbacks, he intended to defraud Zenith further by giving Greensphan the favored treatment for which Yonan was paid.

The evidence also supports a finding that George contemplated Zenith would be defrauded of Yonan's honest and faithful services. George billed Greensphan for "commissions" on the Circle of Sound cabinets Greensphan sold Zenith though he provided no services to Greensphan. Checks totalling about $100,000, approximately one-third of the commissions, then passed from George to Yonan, with George apparently retaining an unmerited two-thirds. That George's payments to Yonan had their source in Greensphan's commission payments to George is shown by Yonan's call to Greensphan's accountant asking about the commission sums paid to George by Greensphan and by Yonan's checking the shipping quantities on an A & G invoice with Greensphan's plant superintendent. George can hardly claim to have been an unwitting conduit for the payments from Greensphan to Yonan. He submitted spurious invoices based on the number of cabinets Greensphan shipped to Zenith and made an enormous profit in the process. He, Greensphan, and Yonan were mutual friends at the inception of the scheme, and, at least on one occasion, were observed together in Accurate's plant. He must have known Yonan's position at Zenith and the relationship between Yonan and Greensphan. If the substantial payments from Greensphan to Yonan were not designed to compromise Yonan's fiduciary duties to Zenith, why were they not made directly and openly instead of through George and disguised as commission payments to him? Why would the transaction be so shrouded in secrecy and spuriousness if Yonan could legitimately make and hide from Zenith an enormous profit from his employment position or curry Greensphan's favor? It would take a man of incredible naïveté to play George's role in this scheme and not understand that Yonan was giving less than full measure of loyalty and honesty to Zenith. At least George must have known that some actual injury to Zenith was the reasonably probable result of this scheme. See United States v. Regent Office Supply Co., *supra*, 421 F.2d at 1182.

■■■ Having admitted that he agreed to make the kickback payments to Yonan to ensure that he would not lose the Circle of Sound cabinet business, Greensphan argues that he lacked the requisite intent on the ground that he was the victim of extortion. He urges what is really an affirmative defense of extortion. However, he had no contractual agreements entitling him monopolistically to continue to sell cabinets to Zenith. He had no right to be protected from future competition. If he really feared Yonan would wrongfully try to shift the cabinet business to a competitor, why did Greensphan not go to Zenith with the report that Yonan had asked for the kickbacks? He presented nothing to indicate why this course was not open to him. And certainly he could have gone to Zenith when and if Yonan had decided that a less deserving competitor should get the business. Under some circumstances a threat of economic injury may constitute a defense, but not here. Furthermore,

---

7. Lest there be any doubt on that score, it may be noted that Yonan twice signed Zenith's conflict-of-interest policy, thus acknowledging this.

since, by Greensphan's own account, Yonan did not actually threaten him with economic harm, the evidence does not support his claim. United States v. Miller, 340 F.2d 421, 425 (4th Cir. 1965). Accordingly, his tendered instructions B and C were properly refused. Under the evidence Greensphan's payments could be considered by the jury as an attempt to obtain an advantage against competition by purchasing Yonan's loyalty. Greensphan's "theory of defense," to the extent it was valid and supported by evidence, was adequately safeguarded because the instructions given as to intent, "knowingly" and "willfully" as used in the two statutes specified in the indictment permitted the jury to accept the hypothesis that Yonan's economic pressure negatived Greensphan's intent to harm Zenith. Its choice not to do so was supported on this record.

Thus we conclude that there was sufficient evidence for the jury to find that each defendant intended to defraud Zenith.

*Admissibility of Zenith's Conflict-of-Interest Policy*

The Government introduced Zenith's conflict-of-interest policy as bearing on the knowledge of Yonan and Greensphan. It was clearly admissible for this purpose since Yonan's and Greensphan's knowledge of that policy bore on their intent to defraud, though it was not essential for proving that intent. The record does not show that Zenith's conflict-of-interest policy was admitted with reference to George's intent. The trial testimony went to connecting the policy with Yonan and Greensphan only. The jury was correctly instructed that admissions, acts or statements of other *defendants* in the scheme were attributable to all only if the jury found the existence of a joint venture and if in furtherance thereof. No error was committed with respect to receiving in evidence Zenith's conflict-of-interest policy for the limited purpose for which it was offered.

*Refusal to Sever Yonan from Greensphan's Trial*

Yonan claims that Greensphan's defense was antagonistic, thus entitling Yonan to a mistrial and a separate trial. Here we fail to discern any conflict of defense strategies, much less one so irreconcilable "that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." United States v. Robinson, 139 U.S.App.D.C. 286, 432 F.2d 1348, 1351 (1970). True, Greensphan testified that Yonan asked him for kickbacks, but Yonan's only real defense to what the Government proved he did was that his conduct could not have defrauded Zenith. This defense would not be undercut because he asked Greensphan for kickbacks, and Greensphan presented the same defense.

Yonan's real complaint is that Greensphan, in an attempt to save himself, made Yonan out to be a blackmailer, and the jurors "could well conceive it their duty to remove such a person from society." But "the mere fact that * * * one may try to save himself at the expense of another is in itself alone not sufficient grounds to require separate trials * * *." United States v. Hutul, 416 F.2d 607, 620 (7th Cir. 1969), certiorari denied *sub nom.* Sacks v. United States, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499. And Greensphan did not save himself. Furthermore, under the instructions given, the jury could not have convicted Yonan of extortion, and we see no substantial prejudice to warrant upsetting the presumption that the jurors followed the law as given to them. In sum, having found no clear likelihood of detriment to Yonan's defense or confusion in the jury's mind so great as to prejudice his fair trial, we find the trial judge did not abuse his discretion by trying all participants in the scheme together. United States v. Kahn, 381 F.2d 824, 838–839 (7th Cir. 1967), certiorari denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661.

Judgments affirmed.