UNITED STATES of America,
Plaintiff-Appellee,

v.

John L. LEA, Defendant-Appellant.

No. 79–1940.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1980.

Decided Feb. 19, 1980.

Rehearing and Rehearing En Banc
Denied March 24, 1980.

Terrence E. Leonard, Andrew A. Ziemba, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U.S. Atty., Michael L. Siegel, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, WOOD, and CUDAHY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

A jury convicted appellant Lea on twenty counts of engaging in a scheme to defraud within the meaning of the federal mail fraud statute. 18 U.S.C. § 1341.[1] The principal ground upon which he appeals is that the government failed to establish a sufficient nexus between the scheme and the mailings that serve as the jurisdictional basis for prosecution under that statute.

I.

A. *Background*

Safeway Stores, Inc. (Safeway) employed Lea as manager of the meat buying department of its Midwest Buying Office.[2] In that capacity, Lea was responsible for the purchase at wholesale of fresh meat for ultimate sale in Safeway's retail food stores.

Standard operating procedure, to the extent relevant to this appeal, required that purchases be made using an offer and acceptance method. Safeway publicized specifications of its immediate needs, and interested suppliers or brokers promptly extended offers, usually by telephone. Negotiation tactics such as disclosure of a competing offer or indication of price relativity were strictly prohibited. . The buyer accepted the most favorable offer by telephoning the supplier or broker and conveying a purchase order number. The original of the corresponding purchase order form was then mailed to the supplier or, where a broker conveyed the offer, to the broker. Safeway's corporate office, accounting department, and receiving warehouse each received copies, and the Midwest Buying Office retained one. Corporate headquarters received additional confirmation each week when the Midwest Buying Office sent a form listing suppliers who extended offers, the details of each offer, accepted offers, and where relevant, intermediary brokers.

Safeway's corporate policy required that buyers abide by the wishes of the seller regarding whether to transact business directly or through a broker. Although the policy expressly forbade buyers from attempting to deal directly for the purpose of eliminating a broker's commission, Safeway encouraged buyers wherever possible, but within the constraints of the foregoing limitations, to deal directly with suppliers. Nationally, in an average year, Safeway purchased ninety-seven to ninety-eight percent of its carcass beef in transactions free of broker intervention.

B. *The Scheme to Defraud*

Allen Petlin and William Horwich were partners in a Chicago meat brokerage busi-

---

1. 18 U.S.C. § 1341 provides:

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. The Midwest Buying Office, one of four scattered nationwide, was originally located in Chicago but relocated to Prairie Village, Kansas in May 1971.

ness known as Mutual Brokerage Service (Mutual). Initially, Mutual was unable to do any significant business with Safeway's Midwest Buying Office. That changed suddenly in late 1966 when Petlin and Horwich began paying kickbacks to Lea on orders that Mutual placed for its client suppliers.

Petlin or Horwich frequently telephoned Lea to convey offers to supply Safeway with carcass meat. During these conversations Lea would often divulge the content of Mutual's competitors' offers and Safeway's anticipated future requirements. Lea did not provide comparable information to any other broker or supplier. When necessary, Lea also directed Mutual to specific suppliers that Lea believed would allow Mutual to offer a more competitive price. Two suppliers offered further evidence of Mutual's favored status when they testified that Mutual contacted them shortly after they had tried unsuccessfully to do business directly with Lea. Offers similar in price and quantity to those tendered directly to and rejected by Lea were accepted when tendered through Mutual. Extreme pressure was thus placed on suppliers to extend offers to Safeway only through Mutual.

Upon receipt of the purchase order form confirming acceptance, Mutual, as a matter of course, mailed confirmations of sale to the appropriate supplier and to the Midwest Buying Office. After delivery, Safeway sent payment directly to the supplier. Each month Mutual mailed to suppliers with whom they did business during the preceding month a brokerage statement listing commissions due and owing. Suppliers then mailed commission checks directly to Mutual. As far as Safeway was concerned, the

broker effectively dropped out of the transaction upon receipt of the confirmation of sale. Commissions were a matter exclusively between supplier and broker. Safeway, however, remained interested in monitoring its buyers' use of brokers. Accordingly, standard operating procedure required that when a buyer consummated a transaction through a broker he make a notation to that effect on the purchase order form and the weekly cumulative form. Nevertheless, at Lea's direction, forms sent from the Midwest Buying Office to Safeway's corporate headquarters contained no indication of Mutual's involvement.

Mutual deposited suppliers' commission checks in a checking account at a Chicago bank and paid kickbacks to Lea from funds secured from the same account. The amount of each kickback was keyed to the volume of business that Mutual placed with Safeway. Over the eight-year duration of the scheme, Mutual earned $537,350 in commissions and kicked back $29,000 to Lea. During the same period, Mutual's share of Safeway's midwest carcass beef purchases increased from a few scattered sales to more than fifty percent.

## II.

The government based its prosecution under the mail fraud statute on the theory that the foregoing constituted a scheme among Lea, Petlin, and Horwich to defraud Safeway of the honest and faithful services of its employee, Lea.[3] *See United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v.*

3. Lea asserts that Safeway suffered no pecuniary loss and that therefore the mail fraud statute is inapplicable. We find no support in the record for this characterization of the facts, nor is there support in the case law for this characterization of the law. Two suppliers testified that the prices at which they offered and sold beef to Safeway were increased to cover the cost of Mutual's commission charges. One of these suppliers testified further that shortly after Lea rejected a direct offer from his supply company, Mutual contacted him and negotiated a sale to Safeway at a higher price. Even accepting for the moment Lea's dubious as-

sumption that the foregoing does not establish pecuniary loss, the government's theory of prosecution cannot be assailed on this ground. The law in this circuit is that pecuniary loss is not an essential element of the crime of mail fraud. *United States v. Reicin*, 497 F.2d 563, 571 (7th Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *United States v. George*, 477 F.2d 508, 512 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *see United States v. Reid*, 175 U.S.App. D.C. 120, 126, 533 F.2d 1255, 1261 (D.C. Cir. 1976).

*George,* 477 F.2d 508 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973). Alleged to be in furtherance of the scheme were three kinds of mailings: (1) written confirmations sent by Mutual to suppliers confirming the sale of meat through Mutual to Safeway, (2) brokerage statements sent by Mutual to suppliers detailing charges for brokerage commissions on sales to Safeway, and (3) checks in payment of the brokerage commission charges sent by suppliers to Mutual.

■■■ Lea argues on appeal that the nexus between the mailings and the scheme to defraud Safeway is too attenuated to allow prosecution under the mail fraud statute. That Lea did not participate in any of the mailings does not preclude application of the statute. *See Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Section 1341 is applicable not only where one "places" an item in a mail depository but also where one "knowingly causes" a mailing. The Supreme Court has settled the question that a mailing is knowingly caused "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. . . . " *Id.* at 8–9, 74 S.Ct. at 363. Here, the parties to the scheme contemplated that Mutual would generate substantial commissions on transactions between suppliers and Safeway and then pay kickbacks to Lea from these funds. Mutual's engagement in the ordinary business practices of a meat broker was therefore not only foreseeable but also essential to the scheme. Under *Pereira,* the only legal conclusion that can flow from these facts is that Lea knowingly caused the mailings that serve as the basis of his mail fraud conviction.

■■■ Notwithstanding the foreseeability of the mailings, Lea raises a number of subsidiary points that he asserts make the nexus between the mailings and the scheme too attenuated to satisfy the statutory requirement that the mailing be "for the purpose of executing such scheme." At the outset, we note that the government need not show that the mailing was an essential part of the scheme; the mail fraud statute requires only that the mailing be incident to an essential part of the scheme. *Compare id.* at 8, 74 S.Ct. at 362, *with United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). We held previously in *Ohrynowicz v. United States,* 542 F.2d 715 (7th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976), that a mailing satisfies this requirement where it is a normal concomitant of a transaction that is essential to the fraudulent scheme.

The basis of the mail fraud prosecution in *Ohrynowicz* was a "check-kiting" scheme,[4] in which the defendants opened checking accounts at a number of banks using fictitious names and addresses. All of the fraudulent transactions were carried out with the temporary nonpersonalized checks that the banks hand-delivered immediately upon opening the accounts. Consequently, the government instead relied on the printers' later mailings of the personalized checks that the banks routinely ordered for its customers. These mailings, clearly not essential to the scheme,[5] were ordinary incidents of an essential element—the opening of checking accounts. We found that relation sufficient despite the fact that the items mailed were not instruments of the fraudulent scheme.

■■■ Our examination of the record in the case at bar reveals substantial evidence supporting the government's theory of a broad-based scheme to defraud among Lea, Petlin, and Horwich. By steering a major portion of Safeway's beef purchases to suppliers dealing through Mutual, the scheme

---

**4.** "Check-kiting," as its name implies, involves the floating of worthless checks between bank accounts containing insufficient funds. By taking advantage of the time lag necessary for clearance, participants temporarily may be able to conceal fraudulent cash withdrawals.

**5.** The defendants probably would have preferred that the printers not mail the personalized checks since the only foreseeable consequence of those mailings was to facilitate the banks' discovery of the fraud.

established Mutual as a conduit for funds, some of which were kicked back to Lea. An indispensable element of the scheme was the use of Mutual as a broker through which to funnel Safeway's purchases. Mutual's mailings of confirmations and brokerage statements, and the suppliers' mailings of commission checks were normal concomitants of the brokerage transactions and were therefore incident to an essential element of the scheme.[6]

The relation between the scheme and the mailings here is even closer than that found sufficient in *Ohrynowicz*. In that case, though the mailing was incident to an essential element, the items mailed were at best superfluous to the success of the scheme. Here, the items mailed, though probably not absolutely essential to success, furthered the scheme. To obtain funds to pay the kickbacks, Mutual had to secure commission payments from the suppliers who sold to Safeway. In the ordinary course of business, the confirmations and commission statements facilitated receipt of the commission checks, which, after being deposited in Mutual's bank account, served as the source of funds for the payments to Lea.

 We do not hold today that all kickback schemes may be prosecuted under the mail fraud statute merely because one of the participants uses or causes another to use the mails. The government must still show, as it did here, the requisite nexus between the scheme and the mailings relied upon to invoke the statute. But the existence of that nexus in a particular case should not be evaluated in a vacuum. Proper analysis demands at the threshold a close examination of the parameters of the scheme. Where that examination discloses that an essential element of the scheme is expansion of a legitimate business into nonlegitimate areas, mailings incident to the nonlegitimate activities may serve as the basis for prosecution under the mail fraud statute.

### III.

 Another Chicago-based meat broker testified that ten or twelve years before trial Lea offered to direct some of Safeway's meat purchases to him provided he kicked back a portion of the commissions earned on those purchases. The trial judge admitted that testimony for the purpose of showing motive and intent. Rule 404(b) of the Federal Rules of Evidence authorizes the admission of evidence of "bad acts" for this limited purpose when its probative value outweighs its prejudicial effect. *United States v. Weidman*, 572 F.2d 1199, 1202–03 (7th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). The necessary balancing is left to the sound discretion of the trial judge. *See United States v. Jones*, 438 F.2d 461, 465 (7th Cir. 1971). Although not the exclusive indicia of probativeness, the prior act must be "similar to the offense charged and close enough in time to be relevant." *United States v. Fierson*, 419 F.2d 1020, 1022 (7th Cir. 1969). The testimony here at issue demonstrated that Lea had previously sought to establish a relationship with another meat broker similar

---

**6.** Lea's restrictive definition of the parameters of the scheme serves as the basis for a number of his other assertions of error. He contends first that the government's reliance on mailings that occurred before the payments of kickbacks is not supportable under the mail fraud statute. Implicit in this argument is that the scheme did not begin until payment of the first kickback. As we view the scheme, it began when Lea first proposed the arrangement to Petlin and Horwich. Accordingly, none of the mailings alleged in the indictment occurred before commencement of the scheme.

The contention that five of the counts cannot stand because the mailings upon which they were based occurred after the last kickback is similarly without merit. Mutual's receipt of commissions on the last of the sales that it brokered had its roots in the preferential treatment accorded it by Lea. Since the payment of the last kickback did not mark the conclusion of the scheme, Lea's reliance on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is misplaced.

Lastly, we reject Lea's argument that the government's failure to link specific kickbacks to specific mailings is fatal. Lea, Petlin, and Horwich devised a continuing scheme to defraud. The government satisfied its burden of showing the existence of a sufficient nexus between the mailings and the continuing scheme. Greater specificity is not required.

to the relationship with Mutual. Further, the testimony related to a meeting that occurred no later than two years after commencement of Lea's relationship with Mutual.

We recognize that admission of evidence of prior "bad acts" is always prejudicial. However, under these facts, there has been no showing that the trial judge's decision to admit the evidence was an abuse of discretion.

### IV.

 We have considered Lea's remaining contention—that the trial court improperly instructed the jury on the weight to be given the testimony of witnesses testifying under grants of immunity—and find that it lacks merit.[7] *See United States v. Demopoulos*, 506 F.2d 1171, 1179–80 (7th Cir. 1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975).

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

I agree that each kickback payment need not be related to a specific shipment of meat (or the mailings pertaining to it). I do think, however, that all the shipments of meat (and related documents), furnishing the basis of the indictment, must have arisen from a transaction in which Lea participated. The government as much as conceded that the latter relationship was not affirmatively and specifically established. For example, the government asserts at pp. 24–25 of its brief:

> "Further, even if a Mutual offer was accepted by an employee other than Lea, that fact by itself would not remove the transaction from the fraudulent scheme.

Mutual's offer would nonetheless have been formulated with the benefit of knowledge of competitor's prices improperly given by Lea in violation of company policy. In addition, the suppliers were compelled to make their offers through Mutual by their inability to do business directly with Lea."

The facts assumed by these arguments are unclear. A "nexus" based on such dubious arguments is insufficient. I respectfully dissent.

---

7. The trial judge read the following instruction:

The witnesses, Allen Petlin and William Horwich, testified under a grant of immunity, pursuant to a court order, after a petition by the government was filed requesting such an order. Under the law, none of the testimony during this trial can ever be used against them in any subsequent criminal proceeding. However, if any one of them testified untruthfully under this grant of immunity, he could be prosecuted for perjury or the making of a false statement even though he was testifying under a grant of immunity.

The testimony of a witness who provides evidence against a defendant for immunity from prosecution, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the witness' testimony has been affected by interest, or by prejudice against defendant.