**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ivan BULJUBASIC and Slobodan
Pavlovic, Defendants-Appellants.**

**Nos. 86–1263, 86–2269.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1986.

Decided Jan. 7, 1987.
Rehearing En Banc Denied Feb. 2, 1987
in No. 86–1263.

Frederick F. Cohn, Frederick F. Cohn Ltd., Jeffrey Steinback, Chicago, Ill., for defendants-appellants.

Joan Bainbridge Safford, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Robert Samuelson put the torch to an occupied apartment building in Chicago. The effort to destroy the building failed; Samuelson tried and failed again three days later; he was caught after trying the third time. Samuelson identified Ivan Siprak and Ilija Zabic as the people who had hired him and furnished gasoline, but they fled with the aid of $9,000 they had received from Slobodan Pavlovic, the real estate dealer who had sold the building to Ivan Buljubasic and arranged for substantial insurance on it. Siprak and Zabic eventually were caught. Samuelson and Siprak pleaded guilty to attempted arson; Zabic was convicted of arson after a jury trial and became the prosecution's star witness in the trial of Buljubasic and Pavlovic.

Zabic testified that Buljubasic hired him to find an arsonist, so that Buljubasic could collect insurance on the dilapidated building. Buljubasic was convicted of violations of the Explosives Control Act, 18 U.S.C. § 844(i), for arranging the arson and participating in its execution; of mail fraud, 18 U.S.C. § 1341, for collecting on the insurance policy; and of conspiring to do these things. He received a total of 12 years' imprisonment, was fined $41,000, and was directed to pay restitution of $4,200. Pavlovic was charged with the conspiracy, with aiding and abetting Buljubasic by paying

Zabic, and with threatening Zabic to prevent his testimony. Two weeks into the joint trial, Pavlovic's case was severed from Buljubasic's and Pavlovic was granted a mistrial. Pavlovic vowed to testify that he knew what the payment to Zabic was for and paid Zabic in fear of his life; he depicted Buljubasic as a violent person who would not have let Pavlovic leave the room alive if he had not given $9,000 to Zabic. The district court thought that this degree of conflict in the defenses precluded a continuation of the joint trial.

The joint trial produces the only substantial issues on appeal. Buljubasic contends that Pavlovic's lawyer tried to fix the blame on Buljubasic, creating prejudice that requires reversal. Pavlovic maintains that the double jeopardy clause of the fifth amendment precludes a second trial after the mistrial. Both arguments depend on the circumstances that led the trial to proceed for so long before the severance was granted.

## I

The arsons took place in January 1981. Zabic was convicted in 1983. Buljubasic and Pavlovic were indicted in October 1984. The indictment charged a common scheme, making the joinder proper under Fed.R. Crim.P. 8(b). At the time of the indictment the prosecutor had little reason to think that Buljubasic and Pavlovic would advance antagonistic defenses. Buljubasic had denied from the beginning knowing about or having anything to do with the arson, or even knowing Zabic (more than casually) until after Zabic's conviction. (Buljubasic maintained this position through his trial.) Pavlovic had testified at Zabic's trial and before a grand jury; he also had given statements to the prosecutors. On all occasions Pavlovic had denied knowing the purpose of any payment his company made to Zabic (the checks to Zabic had been signed by one of Pavlovic's employees, not by Pavlovic personally) or having any involvement in the scheme. Pavlovic said that the $9,000 were escrowed funds for repairs that Zabic and others were performing for Buljubasic. Perforce Pavlovic had not claimed to be the victim of coercion.

More than 13 months after the indictment—and only 12 days before trial—Pavlovic moved for a severance under Fed.R. Crim.P. 14. The two-page motion stated in a cursory fashion that the defenses were antagonistic. The only detail was:

> Buljubasic intends to take the stand on his own behalf and testify that Defendant Pavlovic hired ... Zabic to burn the building.... Similarly, it is Defendant Pavlovic's intention to take the stand and testify that to his knowledge co-defendant Buljubasic hired Zabic to burn the building.

As it turned out, Pavlovic was wrong about Buljubasic's defense; Buljubasic never pointed a finger at Pavlovic or anyone else. The motion, which Buljubasic did not join, does not provide details or suggest that Pavlovic will accuse Buljubasic of coercion.

Pavlovic later filed three affidavits in support of his motion. One, dated November 7, is by Buljubasic's counsel, who stated that Buljubasic would testify and that "I shall argue to the jury *if I have been able to develop evidence* ... that ... Pavlovic may have arranged with Mr. Zabic for the burning of the building." (Emphasis added.) Counsel never developed that evidence. A second, dated November 12, is by Pavlovic's counsel. This affidavit stated unequivocally that the defense would be that Buljubasic hired Zabic and Siprak to burn the building and that "Buljubasik [sic] authorized payment to Ilija Zabic and had Slobodan Pavlovic pay Zabic the sum of $9,000." Again no mention of coercion, and no suggestion that Pavlovic would concede that he knew the purpose of the payment. The third affidavit is by Pavlovic and was tendered at the hearing on November 14. This affidavit states that Pavlovic paid $9,000 to Zabic at Buljubasic's instructions and that Pavlovic knew Buljubasic hired Zabic to burn the building.

In open court on November 14, Judge Grady denied Pavlovic's motion for severance and Buljubasic's belated oral motion

for the same relief. Judge Grady thought that the allegations of conflicting defenses were too sketchy. Indeed they were, especially so in light of the fact that for more than four years both Buljubasic and Pavlovic had affected absolute ignorance of the events. More, the prosecutor and the defense counsel had agreed on an "open files" discovery policy, and the prosecutor represented to Judge Grady that the defendants had turned over nothing indicating that there would be a conflict. The most that could be said is that Pavlovic planned to testify that he made a payment to Zabic at Buljubasic's direction and without knowing its purpose—for to admit knowing its purpose would be to confess guilt. Pavlovic's further assertion that he knew that Buljubasic had hired Zabic did not include essential details, such as when Pavlovic learned this information, how he planned to prove it, and what use he intended to make of it at trial.

■■■■ There is a strong interest in joint trials of those who engaged in a common enterprise. See *United States v. Velasquez*, 772 F.2d 1348, 1352–54 (7th Cir.1985). Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one or the other (or both) undoubtedly committed a crime. The joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome. See *United States v. Oxford*, 735 F.2d 276, 280 (7th Cir.1984). This is not to deny that a joint trial may create a risk that the jury will hear evidence that is inadmissible with respect to one defendant. Inconsistent defenses also may create prejudice. But as a rule evidence and arguments may be controlled by the court, and inconsistent defenses are not enough to require severance. *United States v. Joyce*, 499 F.2d 9, 21 (7th Cir.), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *United States v. Hutul*, 416 F.2d 607, 620–21 (7th Cir.1969), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970). Finger-pointing is an acceptable cost of the joint trial and at times is even beneficial because it helps complete the picture before the trier of fact. Unless the defenses are so inconsistent that the *making* of a defense by one party will lead to an unjustifiable inference of another's guilt, or unless the acceptance of a defense *precludes* acquittal of other defendants, it is not necessary to hold separate trials. See *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985); *United States v. Banks*, 687 F.2d 967, 973 (7th Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1208, 75 L.Ed.2d 448 (1983); *United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980); *United States v. George*, 477 F.2d 508, 515 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973). If Pavlovic should persuade the jury that he gave money to Zabic without knowing its purpose, that would not preclude Buljubasic's acquittal. So as of November 14 it was appropriate to proceed toward the joint trial four days away.

On November 18 Pavlovic renewed his motion for severance. For the first time, counsel for Pavlovic stated that he would raise a defense of compulsion. Counsel said that he would produce evidence "that the reputation of Mr. Buljubasic was one of a dangerous one [sic]; that there were guns present in the room on that day." Judge Crabb, hearing the case by designation, was surprised, for none of the papers in the case mentioned compulsion; the prosecutors were surprised as well and asked the judge to forbid use of the defense, which was not supported by any of the reciprocal discovery or by Pavlovic's testimony on other occasions. The belated nature of the claim led both prosecutor and judge to doubt that it could be sustained. Judge Crabb concluded, however, that Pavlovic's depiction of Buljubasic as a violent thug would require a severance. The court

then denied the motion and instructed Pavlovic's counsel to avoid mention of guns or threats in front of the jury until it became clear that (a) Pavlovic would testify to these things, and (b) there was some evidence to support them; intimations from counsel would not be allowed to take the place of evidence.

For the next three days Pavlovic's counsel avoided the subject, and Judge Crabb carefully reduced the jurors' exposure to any conflict that might develop in the defenses. On November 21, out of the jury's presence, Pavlovic's counsel sought permission to ask Zabic whether Buljubasic carried guns. Counsel said he did not know what Zabic would reply. The prosecutor had inquired of Zabic what answer he would give to such a question; Zabic said he would reply that he knew Buljubasic to carry guns but that he did not see a gun on the day Buljubasic told Pavlovic to pay the $9,000 over to Zabic. The judge tried to find out whether Pavlovic's counsel was fishing or whether he really was going to offer a coercion defense. Counsel replied: "it may be duress; .... If [the prosecutor] or anyone in this building knows me, I don't tell anyone what my defense will be." Despite this warning, counsel then explained that he planned to use Buljubasic's reputation for carrying guns to explain why Pavlovic turned over the $9,000 knowing what the money was for. This was the first time that Pavlovic or his counsel had conceded knowing the purpose of the payment when it was made. If this concession were made to the jury, only a coercion defense would avoid criminal liability. Judge Crabb continued to doubt that there would be such a defense and restricted counsel's cross-examination of Zabic. The judge allowed counsel to ask Zabic whether anyone carried weapons at the meeting with Pavlovic but declined to allow Zabic to testify about Buljubasic's reputation or use of guns on other occasions, stating that she would allow such evidence only after Pavlovic had testified that he knew that Buljubasic had a reputation for violence.

The subject stayed off limits through December 6. Judge Crabb precluded Pavlovic's counsel from cross-examining Buljubasic on December 5 about Buljubasic's use of guns. But on December 6, the time had come for Pavlovic to testify. Judge Crabb ruled that Pavlovic could make a coercion defense if his testimony supported it. Yet if Pavlovic so testified, Buljubasic's defense would be irreparably damaged, and if the judge precluded the inquiry, Pavlovic's defense would be destroyed. There remained three possibilities: complete the trial of Buljubasic only, complete the trial of Pavlovic only, or omit the defense. The judge explored the third possibility by requiring Pavlovic to submit to a brief examination out of the jury's presence. Pavlovic testified during this voir dire that he knew the purpose of the payment and gave the money to Zabic only as a result of Buljubasic's threats, including a representation that a goon was waiting outside. Severance was now unavoidable, and the judge asked the prosecutor which case she wanted to complete. She wanted to finish Buljubasic's case, so the judge severed Pavlovic's case and granted a mistrial. The prosecutor then granted Pavlovic use immunity under 18 U.S.C. § 6003 and required him to testify against Buljubasic, producing evidence that Buljubasic instructed Pavlovic to pay Zabic and that Pavlovic knew why Zabic was receiving the money. Buljubasic was convicted, and Pavlovic's case was set for a second trial.

## II

Pavlovic's pretrial appeal is authorized by *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). Pavlovic contends that the double jeopardy clause bars his retrial because there was not "manifest necessity" for the severance and mistrial. Pavlovic concedes that after his voir dire examination on December 6 it was evident that one defendant or the other had to be mistried. Pavlovic was the logical one to remove, because Buljubasic had finished his testimony and Pavlovic had not begun. But Pavlovic insists that this is the wrong perspective. The manifest necessity on December 6, he contends, flowed

from the erroneous denial of the motions to sever on November 14, 18, and 21. There was no manifest necessity for these errors, the argument concludes, and therefore there is no support for a second trial.

We have already concluded that the denial of the motion on November 14 was not erroneous. Neither was the denial on November 18. A last-minute surprise does not require a court to stop a trial in its tracks, especially when there is substantial doubt that one defendant will make good his threat to conduct an antagonistic defense. Not until November 21 was the extent of the conflict clear, and even then it remained to be seen whether Pavlovic would testify in a way that jeopardized Buljubasic's interests. There are, however, two more general replies.

■ One is that the double jeopardy clause does not require "manifest necessity" for the events that triggered the mistrial; manifest necessity for the mistrial itself will ordinarily permit a second trial. See *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). If Pavlovic's perspective were correct, mistrials caused by prosecutorial or judicial errors could never be followed by second trials, because it is never manifestly necessary to make a mistake. Yet *Somerville* held that a prosecutor's blunder in drafting an indictment supplied manifest necessity for a mistrial. See also *Lee v. United States*, 432 U.S. 23, 33–34, 97 S.Ct. 2141, 2147–48, 53 L.Ed.2d 80 (1977). Often the blunder escapes notice until the trial is over, yet a reversal may be followed by a second trial. See *Burks v. United States*, 437 U.S. 1, 12–15, 98 S.Ct. 2141, 2147–49, 57 L.Ed.2d 1 (1978). If the proceeding is doomed to be reversed, it may be stopped short.

■ The other reply is that "manifest necessity" is unnecessary when the defendant moves for a mistrial. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Pavlovic moved for severance and mistrial too many times to count. The court finally gave him the relief he sought so avidly, and the double jeopardy clause does not prevent retrial. Only when "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial" (*Oregon v. Kennedy*, 456 U.S. at 679, 102 S.Ct. at 2091) does the "manifest necessity" standard come into play. Pavlovic does not contend that Judge Crabb or the prosecutor was baiting him into moving for a mistrial or sabotaging his defense until there was no other alternative. Their conduct was entirely above board, and an argument that they were trying to undermine a successful defense in order to have a better crack the second time would be ludicrous. Pavlovic's motions for mistrial started at the beginning of trial.

Pavlovic replies that he hadn't moved for mistrial lately, so the severance and mistrial of December 6 must be assessed as one on the court's own motion. The premise is true, but the conclusion does not follow. Pavlovic had been insisting on severance all along. The judge said she was granting Pavlovic's pending motion. When the judge finally proposed to give Pavlovic what he sought, Pavlovic did not tell the judge that he had changed his mind. The court was entitled to treat this as a consensual mistrial.

Pavlovic cites cases such as *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and *United States ex rel. Clauser v. McCevers*, 731 F.2d 423, 426 (7th Cir.1984), holding or implying that when a judge surprises counsel by a declaration of mistrial, the failure to object cannot be taken as consent. *Jorn* was the classic case of the overbearing judge, and *Clauser* one in which the mistrial was designed to rescue the prosecutor from a bad turn of events. Neither *Jorn* nor any other case holds that just because the *suggestion* of mistrial comes from the judge initially, the defendant's acquiescence is irrelevant. Parties may give assent in many ways. If a judge should say: "I think a mistrial would be a good idea, but think

this over and let me know if you disagree", the defendant's silence would be assent. The principal functions of the double jeopardy clause are to allow a defendant to get a verdict at the first trial if he wants one and to keep a verdict that is favorable. *United States ex rel. Young v. Lane*, 768 F.2d 834, 837 (7th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 317, 88 L.Ed.2d 300 (1985). Whether the defendant wants a verdict is something he knows best, and when the occasion for choice comes he must choose unless, as in *Jorn*, the judge brooks no opposition, or unless there is insufficient time to deliberate. In *Clauser* things were going the defendant's way, making an inference of assent from silence implausible. Here Pavlovic's defense had been hampered throughout the trial. He had ample time to deliberate. His choice was clear—he made many motions for mistrial and did not retract them or express concern when the judge finally granted the mistrial. The process took more than an hour on December 6, so there was ample time. Pavlovic had only to withdraw his motion and say that he wanted to finish the trial. He did not, so this must be taken as a mistrial on his motion.

■ Pavlovic tries to distinguish *Dinitz* and *Kennedy* on the ground that this mistrial really was granted for Buljubasic's benefit. Yet he never asked the judge to mistry Buljubasic's case and proceed to judgment on his own. Had he done this, we doubtless would have Buljubasic's double jeopardy appeal instead of Pavlovic's. This is why it does not matter that Judge Crabb asked the prosecutor which case should be completed. One or the other had to stop, both defendants had made mistrial motions, and from the perspective of the double jeopardy clause it does not matter which defendant is retried. Finally, it does not matter that Pavlovic testified on voir dire before the court granted the mistrial. This is less of a "preview" of the defense than the prosecutor would have had if Buljubasic's case had been mistried (for Buljubasic had completed his testimony), and less than the prosecutor gets when a case is completed, reversed, and retried. Pavlo-

vic saw the prosecutor's whole case; previews are mutual. There is no suggestion that either the court or the prosecutor elicited the testimony in order to gain an unnecessary preview of the evidence. The double jeopardy concern is not that the parties learn each other's evidence but that the defendant loses the opportunity to obtain a verdict that may be favorable. Pavlovic surrendered his opportunity to obtain a verdict from the jury then empaneled, which is a sufficient answer to his double jeopardy contentions.

### III

Zabic testified that Buljubasic hired him to find an arsonist to damage the apartment building. Zabic gave extensive details of conversations, of engaging Siprak and hiring Samuelson, of buying gasoline with Buljubasic, of Buljubasic's giving money to Pavlovic to hold until the job was done. Zabic also testified that Buljubasic helped finance Samuelson's defense and found a lawyer to handle Zabic's own appeal. He described the flight to Florida with Siprak and Howard Vess (who had a minor role in the events); in Florida the trio stayed at a motel owned by one of Buljubasic's business associates. Vess supported the story. Pavlovic testified under a grant of immunity that he received $9,000 from Buljubasic and paid the money to Zabic at Buljubasic's demand, after Buljubasic identified the purpose of the payment. Diane Siprak testified that she heard her husband, Zabic, and Vess refer repeatedly to the job being done for "Ivan the owner", and she participated in some of the collateral events of the plot. The dilapidated condition of the building, the insurance for substantially more than the building's value, and Buljubasic's efforts to remove all tenants from the building support the tale the witnesses told. All in all, the evidence against Buljubasic was quite strong.

■ The power of the case against Buljubasic saps the strength of his claim that the joint trial was prejudicial. The court

kept out all evidence that would have unfairly prejudiced Buljubasic and even prevented Pavlovic's counsel from intimating that Buljubasic may have coerced Pavlovic into cooperating. This reduces Buljubasic to general complaints about having a viper in the defense camp. Doubtless Pavlovic's lawyer focused the jury's attention on any evidence that inculpated Buljubasic and not Pavlovic, but the evidence was there no matter what counsel made of it. See *Ziperstein*, 601 F.2d at 288. Most of what Pavlovic's lawyer did is common in joint trials. The interests of the defendants—Pavlovic's coercion defense to one side—largely overlapped. Zabic inculpated both Pavlovic and Buljubasic; both defendants wanted to destroy Zabic's credibility and undermine evidence that supported Zabic's story. Buljubasic's greatest beef is that Pavlovic's lawyer cross-examined Buljubasic sarcastically. No surprise that he did this. Buljubasic alone claimed ignorance. He heard nothing, saw nothing, knew nothing. After Buljubasic denied knowing who burned the building, Pavlovic's lawyer asked him: "You don't know whether Bozo the Clown burned down the building either, do you?" Pavlovic's lawyer had been sarcastic with other witnesses, too, and sarcasm did not add to the evidence already in the lists against Buljubasic. Most of the tactics of Pavlovic's lawyer passed without objection; the rest were handled well by Judge Crabb; the residual effects were well within the tolerable range. See *United States v. Tanner*, 471 F.2d 128, 137 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972).

## IV

Of Buljubasic's plenitudinous claims of error, only four more require discussion.

■ 1. Diane Siprak testified that she heard several of the conspirators say that they were doing the job for "Ivan the owner". She corroborated other details. The district court told the jury to evaluate the testimony of many witnesses with caution because they were accomplices; it did not give an accomplice instruction concerning Diane Siprak's testimony. The prosecutor defends this decision, arguing that Diane Siprak did not have the criminal intent necessary to be an accomplice. She was involved in the criminal affairs, however, and it is rarely fruitful to draw fine lines among those implicated in the crime when deciding whether to give accomplice instructions. The failure to give such an instruction with respect to Diane Siprak allowed the prosecutor to portray her as an especially reliable witness; maybe she was, maybe she wasn't, but the power of testimony should not be enhanced by nice distinctions that underlie cautionary instructions to the jury. Still, if it was error to omit the instruction, the mistake was harmless. See *United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 730–32, 88 L.Ed.2d 814 (1986). The court told the jury to take each witness's interest into account in evaluating the testimony, and Diane Siprak's interest in avoiding prosecution had been made known. She was cross-examined fully, and it is impossible to believe that additional instructions telling the jury to treat interested testimony with caution would have affected the outcome of this trial.

■ 2. Buljubasic depicted one of the encounters between himself and Zabic as an effort by Zabic to extort money. The prosecutor asked why Buljubasic had not gone to the police to protest the extortion; Buljubasic answered that by the time of the events in question, he had been identified as a suspect and did not believe that the police would believe anything he said. After a recess, Buljubasic's lawyer objected to this sequence on the ground that Buljubasic was relying on his constitutional right to remain silent. He invoked *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Buljubasic had talked with officials on several occasions and had been given *Miranda* warnings, and his lawyer depicted his failure to report the extortion as a reliance on the warnings. The district court concluded that the warnings were too remote to support such reliance; the last one had been received more than a year before Zabic's supposed effort to ex-

tort money from Buljubasic. On top of that, Buljubasic had talked freely with officials each time he had received the warnings. Because he did not invoke his right to remain silent, the principle of *Doyle* is inapplicable. See *Phelps v. Duckworth,* 772 F.2d 1410, 1412–13 (7th Cir.) (en banc) (collecting cases), *cert. denied,* —— U.S. ——, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985).

■ The district court also prevented Buljubasic from stating to the jury that he relied on the *Miranda* warnings in failing to report Zabic's supposed activities. This restriction was permissible under Fed.R. Evid. 403. Buljubasic proposed to give a cumulative explanation for his conduct. One set of warnings Buljubasic received was accompanied by ethnic slurs from a police officer, and the district judge was entitled to believe that the real purpose of raising the line of argument was to receive sympathy by placing the slurs before the jury. This whole episode was collateral, and Rule 403 allows the exclusion of such detours and excursions.

3. Zabic was impeached by evidence that for years he had denied talking with Buljubasic about the arson. He inculpated Buljubasic only after receiving immunity. He conceded that he talked to his lawyer about the effect the grant of immunity would have on a potential prosecution for perjury for the earlier denials of Buljubasic's involvement. He testified that the attorney sent him a letter with the information that his sentence had been reduced (apparently on account of cooperation) and had informed him that he could be prosecuted for lying under oath in response to the grant of immunity. He invoked the attorney-client privilege with respect to the content of these and other communications, however, and Judge Crabb sustained the claim of privilege.

■ This decision is correct. A client does not waive the privilege by stating facts that outsiders already know or could deduce. Only revelation of portions of communications that are private between attorney and client waives the privilege concerning the residue of the communica-

tion. See *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983). The reduction in Zabic's sentence was a matter of public knowledge; revealing that he was told about it does not waive any privilege concerning the contents of the communication. Similarly, the grant of immunity was public, and disclosing that counsel relayed advice from the judge in open court does not require the witness to lay bare the full communication, which may contain secrets and strategic discussions.

■ 4. Ivan Siprak was the only nontestifying conspirator. Although he was serving a sentence after his plea of guilty to the substantive offenses, he invoked his privilege against self-incrimination, apparently because he feared that truthful testimony might set up a prosecution for earlier perjury. The prosecutor declined to give Ivan Siprak immunity from prosecution. Buljubasic contends that this requires a reversal of his conviction. But the obstacle to Siprak's testimony came from the Constitution itself, and we have never held that the due process clause of the Constitution requires prosecutors to overcome obstacles established by the self-incrimination clause. Although we have on occasion intimated that should selective grants of immunity produce egregiously lopsided access to evidence the price of immunity at the prosecutor's behest may be immunity at the defendant's, see *United States v. D'Antonio,* 801 F.2d 979, 982–83 (7th Cir.1986) (collecting cases), we have never so held. At all events there was nothing lopsided about the presentation of evidence here. Every important character other than Ivan Siprak testified, and many peripheral characters did so too. Buljubasic had a fair trial.

AFFIRMED.