Harold LOVE, Petitioner,

v.

Willis MORTON, et al., Respondents.

Civil Action No. 95–6309 (JEI).

United States District Court,
D. New Jersey.

Nov. 12, 1996.

Loughlin & Latimer by Stephen M. Latimer, Hackensack, NJ, for Petitioner.

Jeffrey S. Blitz, Atlantic County Prosecutor by Jack J. Lipari, Mays Landing, NJ, for Respondents.

## OPINION

IRENAS, District Judge:

Petitioner Harold Love seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that his state court retrial, following a mistrial, violated the Double Jeopardy Clause of the Fifth Amendment. Because petitioner's first trial was terminated without his consent and without manifest necessity, the Court will grant his petition for a writ of habeas corpus.

## I.  BACKGROUND

### A.  Procedural History

On December 5, 1995, after exhausting available state remedies, petitioner filed the instant petition for a writ of habeas corpus advancing a claim based on the Double Jeopardy Clause of the United States Constitution. See U.S. Const. amend V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ."). Because his petition raises a serious constitutional issue, this Court on July 10, 1996, ordered an evidentiary hearing and appointed petitioner counsel pursuant to *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), and 18 U.S.C. § 3006A(g).[1]  The Court held the evidentiary

---

1. The Court ordered the evidentiary hearing on July 10, 1996, without addressing or applying the habeas amendments passed just weeks before on April 24, 1996. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1217. Although the new 28 U.S.C. § 2254(e)(2) appears to change a court's authority to order an evidentiary hearing, *compare Caro v. Vasquez,* No. 93–4159, 1996 WL 478683, at *5 (N.D.Cal. Aug. 19, 1996) ("Amended § 2254(e)(2) limits the circumstances in which a federal court may hold an evidentiary hearing. . . .") *with* Larry W. Yackle, Memorandum on State Court Fact–Finding and Federal Evidentiary Hearings, *in New Developments in the Federal Law of Habeas Corpus* (Federal Judicial Center ed. 1996) ("[T]he 1996 Act does not disturb prior doctrine regarding the circumstances in which a federal habeas court must or can conduct a federal evidentiary hearing. . . ."), most courts have found that the 1996 amendments should not apply to non-capital actions pending on the date of enactment. *See, e.g., Boria v. Keane,* 90 F.3d 36, 37–38 (2d Cir.1996) (discerning that Congress did not intend the statute to apply retroactively to non-capital cases); *Burkett v. Love,* 89 F.3d 135, 138 (3d Cir.1996) ("[W]e need not digress to determine the effect of [the amendments] on the pending action, filed, as it was, before the amendments were enacted."); *Cockrum v. Johnson,* 934 F.Supp. 1417, 1423 (E.D.Tex.1996) ("[Because the death penalty sections] contain[ ] an explicitly retroactive provision, and because [the other sections] contain[ ] no retroactive provision, Congress intended the latter to have only prospective effect."). *But see Lindh v. Murphy,* 96 F.3d 856, 861–69 (7th Cir.1996) (en banc) (applying habeas amendments to pending non-capital cases); *Leavitt v. Arave,* 927 F.Supp. 394, 397 (D.Idaho 1996) (finding congressional intent to apply the amendments retroactively in non-capital cases). Adopting the majority view on retroactivity, the Court need not revisit its decision to order an evidentiary hearing beyond noting that the Court would have ordered an evidentiary hearing under the new 28 U.S.C. § 2254(e)(2) as well.

hearing on September 6, 1996, after which the parties submitted additional briefs. After examining the entire record and determining the credibility of testifying witnesses, the Court now makes the following findings of fact.

## B. *Findings of Fact*

On June 14, 1993, petitioner's trial began in Atlantic County on charges of robbery and first degree armed robbery before the Honorable James Citta of the New Jersey Superior Court. Judge Citta normally sat in Toms River in Ocean County, but had been temporarily assigned to sit in Mays Landing. *See* Hearing Tr. at 8. He lived more than one and a half hours from the Mays Landing Court House. *See* Hearing Tr. at 16. Love was represented by John Hehre, a public defender since 1981. *See* Hearing Tr. at 54. Assistant Prosecutor Ellen E. Loughney represented the State of New Jersey.

A jury was selected on June 14. On the next day counsel delivered opening statements, and the prosecution began its case-in-chief. The second witness called by the prosecution was petitioner's arresting officer, Sergeant Robert A. Schwartz ("Schwartz"). During his direct testimony Schwartz testified that he entered the house, went upstairs to the bathroom, "forced the door open" and saw petitioner "at the sink apparently attempting to rinse his hands" to remove blood which Schwartz observed on Love's hands. First Trial Tr. at 42–43. This testimony was significant since the victim herself had been described as bleeding "profusely." *Id.* at 53. Schwartz also stated that Love had resisted the attempt to handcuff him. *See id.* at 44.

During cross examination defense counsel pointed to inconsistencies between his trial testimony and a report prepared by Schwartz following Love's arrest. Schwartz was forced to concede that Love himself opened the bathroom door. *See id.* at 52. After first insisting that only petitioner's hands were wet, Schwartz corrected himself and admitted that Love's "face and hands were dripping with water." *Id.* at 54. Finally, Schwartz conceded that Love was not charged with resisting arrest and that the report he prepared following the arrest made no reference to any resistance by Love. *See id.* at 55.

At about 3:30 p.m., while in chambers to discuss an evidentiary issue which arose during the testimony of the fourth witness, Detective Lee Ragozzine ("Ragozzine"), Judge Citta received a tragic telephone call from his wife that his mother-in-law had just passed away. Her death was unexpected, and Mrs. Citta was "hysterical." Hearing Tr. at 19. Judge Citta was close to his mother-in-law and was upset not only at her untimely passing, but also at his inability to be immediately available to comfort his wife. *See id.*

Judge Citta informed counsel what had happened and that he "was going to have to make arrangements to get home as quickly as possible." Hearing Tr. at 13. He then telephoned the Honorable Dennis Braithwaite, the presiding criminal judge, to discuss alternatives.[2] After quickly considering the feasibility and propriety of substituting judges or adjourning the trial, the two decided it best to declare a mistrial and retry petitioner with a new jury as soon as possible. *See* Hearing Tr. at 14. Judges Citta and Braithwaite did not then realize the availability of the Honorable Carmen Alvarez. *See* Hearing Tr. at 15. Nor did the two at any time consider the double jeopardy implications of their decision.

When Judge Citta informed counsel of the decision, he did not ask for their input or consent.[3] Counsel, followed by Judge Citta

---

2. As presiding criminal judge, Judge Braithwaite performed supervisory and management functions in addition to trying cases. *See* Hearing Tr. at 65.

3. The in-camera discussion was not on the record and recollections of it were hazy. Judge Citta testified: I do not recall asking either counsel if they consented to a mistrial. I'm not the type of judge that asked permission or asked for consent. Generally in situations like this when I have made a decision—and the decision had been made—and my recollection is that I informed them that this is what I was going to do and to please go in the courtroom and get the jury in there as quickly as possible.

Hearing Tr. at 18. Defense counsel's testimony comports with Judge Citta's recollection. *See* Hearing Tr. at 51–52. The Court will discount

and the jury, then returned to the courtroom, and Judge Citta declared a mistrial. Neither the prosecution nor defense counsel objected, and Judge Citta dismissed the jury to the jury assembly area. Judge Citta then returned to his chambers and left for home. Defense counsel testified that, given the fast pace of the proceedings and impropriety of then contesting Judge Citta's decision, he had no meaningful opportunity to object to the mistrial. *See* Hearing Tr. at 53–55.

Judge Braithwaite then instructed counsel to return the following morning ready to pick a new jury. Later that afternoon, he assigned Judge Alvarez to retry petitioner beginning the following morning.[4] Judges Braithwaite and Alvarez did not consider the possibility of reviewing the day's proceedings and resuming the original trial before the original jury.[5] Instead, the two arranged to impanel a new jury and begin petitioner's trial anew. It was not until defense counsel returned to his office that he first considered the double jeopardy issue.

The following morning, before Judge Alvarez, defense counsel moved to dismiss on double jeopardy grounds. Judge Alvarez denied the motion and the second trial commenced. The prosecution did not call Schwartz as a witness and modified the testimony of Ragozzine to include the victim's description of the perpetrator. *Compare* First Trial Tr. at 87 *with* Second Trial Tr. at 44. The second trial concluded on June 21, 1993, when the jury found petitioner guilty on both robbery counts. The first count merged into the second and the court sentenced petitioner to thirty years imprisonment.

Petitioner appealed to the Appellate Division alleging, *inter alia,* that his retrial violated the Double Jeopardy Clauses of the United States and New Jersey Constitutions. *See* U.S. Const. amend. V; N.J. Const. art. I, ¶ 11. In a published opinion, the Appellate Division rejected this claim, finding that manifest necessity existed for the declaration of a mistrial. *See State v. Love,* 282 N.J.Super. 590, 598–99, 660 A.2d 1246, 1250–51 (App.Div.1995). The New Jersey Supreme Court denied certification. *See State v. Love,* 142 N.J. 572, 667 A.2d 189 (1995).

## II. PRELIMINARY ISSUES

In habeas proceedings, state courts' findings of fact are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d) (applicable old version) ("[A] state court determination ... of a factual issue ... shall be presumed to be correct."); *see also* 28 U.S.C. § 2254(e)(1) (amended version) ("[A] factual determination made by a State court shall be presumed to be correct."). On petitioner's double jeopardy issue, however, the state courts made few findings of historical fact. *See* Second Trial Tr. at 15–16 (determining that petitioner consented to the mistrial and there existed manifest necessity—both mixed questions of fact and law); *Love,* 282 N.J.Super. at 592–95, 660 A.2d at 1248–49 (treating as fact counsel's double jeopardy arguments before Judge Alvarez). To the extent the state's limited factual inquiry involved historical facts, its findings are fully consistent with the facts found in this opinion based on the evidentiary hearing held on September 6, 1996.

On mixed questions of law and fact, in contrast, this Court is not as closely bound to the state courts' determinations. *See Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71

---

the prosecutor's testimony—that Judge Citta impliedly invited comment, *see* Hearing Tr. at 81— as it is inconsistent with the others' recollections and Judge Citta's own testimony.

4. Coincidentally, Judge Alvarez was present in court during parts of petitioner's first trial. Recently transferred from the family division to the criminal division, Judge Alvarez was there to observe and learn from Judge Citta, focusing not on the substance of the happenings but rather on the technical aspects.

5. The day's proceedings consisted of counsel's openings, four witnesses' testimony, and the declaration of a mistrial. In total, the proceedings ran about three hours on tape (transcribed to 122 pages). Judge Alvarez could have either reviewed the tape directly, or had it transcribed. However, due to poor recording quality, there are inaudible patches not transcribed and presumably not decipherable from the tape. Had the trial court used a court reporter instead of a court recorder, it could have minimized or eliminated transcription delays and prevented any loss of trial minutes.

L.Ed.2d 480 (1982). On the contrary, "[i]t is the district judge's duty to apply the applicable federal law to the state court fact findings independently." *Townsend*, 372 U.S. at 318, 83 S.Ct. at 760; *cf.* 28 U.S.C. § 2254(d)(1) (amended version) (instructing deference to state court applications not "contrary to" or involving an "unreasonable application of clearly established Federal law"). Accordingly, this Court will determine *de novo* whether petitioner's second trial, following a mistrial, constitutes a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### III. DOUBLE JEOPARDY

■ The protection of the Double Jeopardy Clause of the Fifth Amendment attaches before a judgment becomes final. *See Crist v. Bretz*, 437 U.S. 28, 35–38, 98 S.Ct. 2156, 2160–62, 57 L.Ed.2d 24 (1978) (attaching jeopardy when the jury has been impaneled and sworn). The Clause thus not only ensures the finality of criminal judgments, but also protects a defendant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978) (quoting *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556–57, 27 L.Ed.2d 543 (1971)). In *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), the Supreme Court noted the considerations underlying this rule:

The State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* at 187–88, 78 S.Ct. at 223; *see also United States v. DiFrancesco*, 449 U.S. 117, 128, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980) ("[I]f the government may reprosecute, it gains an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own."); *Washington*, 434 U.S. at 504 n. 14, 98 S.Ct. at 829 n. 14 (noting that "subtle changes" in government cases "may occur during the course of successive prosecutions").

■ In some circumstances, however, this "valued right" must "be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Thus, the Double Jeopardy Clause does not bar all reprosecutions. A defendant who consents to the termination of a first trial may again be placed in jeopardy for the same offense, so long as the conduct of the judge or prosecutor was not intended to provoke the mistrial. *See Oregon v. Kennedy*, 456 U.S. 667, 672–74, 102 S.Ct. 2083, 2087–89, 72 L.Ed.2d 416 (1982). Even when a defendant does not consent, he may nevertheless be retried if there was "manifest necessity" to terminate the first trial. *See United States v. Dinitz*, 424 U.S. 600, 606–07, 96 S.Ct. 1075, 1078–80, 47 L.Ed.2d 267 (1976); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824) (Story, J.) (coining the phrase "manifest necessity").

#### A. Consent

Mistrials declared with defendant's consent do not bar later prosecution. *See, e.g., Dinitz*, 424 U.S. at 606–07, 96 S.Ct. at 1078–80 (permitting prosecution with defendant's consent or upon finding manifest necessity); *Illinois v. Somerville*, 410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973) (same); *United States v. Jorn*, 400 U.S. 470, 481, 91 S.Ct. 547, 555, 27 L.Ed.2d 543 (1971) (same). By short extension, the Courts of Appeals have adapted this rule to govern implied-consent scenarios. However, in the instant case petitioner's implied consent is far from clear. Accordingly, this Court must look to more subtle indicia of consent and discern if defense counsel's failure to object to the mistrial declaration can constitute implied consent.

In general, a party's failure to object to a ruling, which at the time it is made or proposed could readily be changed, will bar future attempts to review that ruling. *See, e.g.,* Fed.R.Evid. 103(a) (requiring timely objections to evidentiary rulings); Fed.R.Crim.P. 30 (requiring timely objections to jury instructions). Indeed, the Supreme

Court recently reiterated this familiar principle: " 'A constitutional right,' or a right of any other sort, 'may be forfeited in criminal cases ... by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993) (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944)). Given the number of errors in a typical trial, the rule is one of necessity: if every trial error were reviewable notwithstanding a failure to object, courts—particularly appellate courts—would find themselves inundated with endless motions, petitions, and appeals.

■ Where a substantial right is at stake, however, courts have created a narrow exception to this general rule:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the interest of public interest, may ... notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); *see also* Fed.R.Crim.P. 52(b) (codifying the "plain error" exception); *Olano,* 507 U.S. at 730–36, 113 S.Ct. at 1776–78 (clarifying plain error doctrine). *See generally* 3A Charles Alan Wright, *Federal Practice and Procedure* § 856 (2d ed. 1982 & Supp.). Although the exception is narrow and to be invoked only rarely and cautiously, *see Atkinson,* 297 U.S. at 160, 56 S.Ct. at 392; *United States v. Diez,* 515 F.2d 892, 896 (5th Cir.1975), cert.

*denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976), courts have noticed errors of a constitutional dimension with some frequency. *See, e.g., United States v. Shue,* 766 F.2d 1122, 1132 (7th Cir.1985) (finding an impermissible reference to defendant's silence plain error); *United States v. Miller,* 468 F.2d 1041 (4th Cir.1972) (finding magistrate's failure to advise defendant of his right to a jury trial plain error), *cert. denied,* 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973). Consistently, courts have found double jeopardy violations sufficiently "egregious ... miscarriage[s] of justice" to constitute plain error under *Atkinson* and Rule 52(b). *See, e.g., United States v. Jarvis,* 7 F.3d 404, 410, 412–13 (4th Cir.1993) (finding a double jeopardy violation plain error under *Olano* ), *cert. denied,* 510 U.S. 1169, 114 S.Ct. 1200, 127 L.Ed.2d 549 (1994); *United States v. Gunter,* 546 F.2d 861 (10th Cir.1976) (finding a double jeopardy violation plain error), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977); *cf. Camden,* 892 F.2d at 620 (Posner, J., dissenting) ("It is of course true that objections not made are waived, and that often—in deciding for example whether to object to a question asked of a witness—counsel may have only a second in which to make up his mind. The situation is different, however, when [a] judge unexpectedly declares a mistrial and dismisses a jury.").

■ Given these conflicting notions and the constitutional dimension of a double jeopardy violation, this Court must proceed with caution in inferring petitioner's consent from his failure to object. Accordingly, an absolute rule, either implying consent upon mere failure to object,[6] or refusing to imply con-

6. The First, Fourth, Fifth, Seventh, and Eleventh Circuits have taken such a position, focusing exclusively on a defendant's opportunity to object. *See, e.g., United States v. Ham,* 58 F.3d 78, 83 (4th Cir.) ("[A] defendant impliedly consents to a mistrial if the defendant had an opportunity to object to the mistrial but fails to do so."), *cert. denied,* —— U.S. ——, 116 S.Ct. 513, 133 L.Ed.2d 422 (1995); *United States v. Nichols,* 977 F.2d 972 (5th Cir.1992) ("When the defendant ... does not object timely to the declaration of a mistrial, his double jeopardy claim may be vitiated by his consent.") (internal quotation marks omitted), *cert. denied,* 510 U.S. 833, 114 S.Ct. 106, 126 L.Ed.2d 72 (1993); *United States v. DiPietro,* 936 F.2d 6, 9–10 (1st Cir.1991) ("[C]on-

sent to a mistrial may be inferred from silence where a defendant had the opportunity to object and failed to do so."); *Camden v. Circuit Court,* 892 F.2d 610, 615 (7th Cir.1989) ("If a trial judge declares a mistrial ... without giving the defendant an adequate opportunity to object, it would of course be unfair to infer consent absent other circumstances indicating acquiescence."), *cert. denied,* 495 U.S. 921, 110 S.Ct. 1954, 109 L.Ed.2d 316 (1990); *United States v. Puleo,* 817 F.2d 702, 705 (11th Cir.) (inferring consent "where the trial judge expressed a clear intent to declare a mistrial and the defense counsel had an opportunity to object but did not"), *cert. denied,*

sent without some positive manifestation of acquiescence,[7] seems improvident. Rather, consistent with Third Circuit precedent, this Court will consider the totality of the mistrial circumstances in discerning implied consent. *See United States ex rel. Russo v. Superior Court*, 483 F.2d 7, 17 (3d Cir.) (considering a variety of factors in determining whether defendant consented to a mistrial), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).[8] Specifically, the Court will articulate and focus on four factors useful in such analysis: (1) counsel's opportunity to object to a mistrial, (2) the extent to which the trial court solicits counsel's views of a mistrial, (3) counsel's awareness of the double jeopardy issue, and (4) the likelihood counsel would have consented.

### 1. Opportunity to Object

Where counsel foregoes a meaningful opportunity to object to a mistrial, silence, while not conclusive, suggests consent. *See supra* note 6 (citing authority relying exclusively on opportunity to object). More than a time measurement, meaningful opportunity incorporates both notions of quantity and quality. After determining the minutes or hours in which counsel may have objected, one must consider additional circumstances surrounding that length of time. Sometimes, as here, the circumstances of proceedings reveal the difficulty of seizing an opportunity to object. In these situations, although counsel may have some time in which to object to the mistrial, counsel has little meaningful opportunity within which to do so.

A judge's availability to counsel can affect the quality of an opportunity to object. Counsel has ample meaningful opportunity to object where following a mistrial declaration the trial judge remains available to entertain other objections, schedule the second trial, or otherwise discuss the case with counsel. *See, e.g., Nichols*, 977 F.2d at 974–75 (finding opportunity to object where after the mistrial declaration counsel and the court planned the retrial); *DiPietro*, 936 F.2d at 11 (finding implied consent where "[t]he trial judge did not precipitously leave, but remained to discuss with the government the error [requiring the mistrial] and to set a new trial date, with the participation of defense counsel"); *Camden*, 892 F.2d at 613, 616 (finding "minimal but adequate opportunity to object" where after mistrial declaration counsel and the court thanked the jurors and set a retrial date); *Puleo*, 817 F.2d at 705 (finding implied consent where "as the jury was departing, defense counsel renewed several other motions, but said nothing regarding the mistrial"); *United States v. Smith*, 621 F.2d 350, 352 (9th Cir.1980) (finding implied consent where after mistrial declaration but before jury dismissal the court and counsel discussed the dismissal language, rescheduled the trial to accommodate witnesses and counsel, and conducted voir dire on two evidentiary issues), *cert. denied*, 449 U.S. 1087, 101 S.Ct. 877, 66 L.Ed.2d 813 (1981).

484 U.S. 978, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987).

7. The Sixth and Ninth Circuits have adopted this view, requiring some positive indication of defendant's willingness to acquiesce to the mistrial. *See, e.g., Weston v. Kernan*, 50 F.3d 633, 637 (9th Cir.) ("A defendant's consent to mistrial may be inferred 'only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order.' "), *cert. denied*, — U.S. —, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995); *Glover v. McMackin*, 950 F.2d 1236, 1240 (6th Cir.1991) ("[C]onsent should be implied 'only where the circumstances positively indicate a defendant's willingness to acquiesce in the mistrial order.' ").

8. At one point the Second Circuit adopted a "totality of the circumstances" approach, *see, e.g., United States v. Goldstein*, 479 F.2d 1061, 1067 & n. 11 (2d Cir.) (looking to "the totality of circumstances" and evaluating "several probative factors ... from which consent may be implied"), *cert. denied*, 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973), although it seems to have since switched to the majority bright-line view. *See Maula v. Freckleton*, 972 F.2d 27, 29 (2d Cir.1992) (citing *Goldstein* for the "totality of the circumstances" position but focusing solely on defendant's opportunity to object), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993). For added authority requiring more than just silence, see 3 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 24.2, at 69 (1984) ("The better view [of implied consent] is that mere silence is not enough, especially when the proceedings were fast paced, the termination of the proceedings abrupt, or the announced basis one which hardly would be affected by defense opposition.").

An objection is more difficult to raise, however, where, as here, a trial judge immediately dismisses the jury, returns to his chambers, then leaves the courthouse. *Cf. Glover,* 950 F.2d at 1240 (finding no consent to mistrial where after the court's swift declaration it immediately dismissed the jury and adjourned); *U.S. v. Bates,* 917 F.2d 388, 393 & n. 7 (9th Cir.1990) (finding no consent to mistrial where after his declaration, trial judge left the courtroom and ignored defendant's request for a sidebar); *Lovinger v. Circuit Court of 19th Judicial Circuit,* 845 F.2d 739, 744 (7th Cir.1988) ("It appears from the record that the judge actually left the courtroom as he finished his statement. He was gone before the defense had any reasonable opportunity to consider the import of his statement and act upon it."). Thus, in the case at bar, Judge Citta's unavailability detracted from defense counsel's opportunity to object to the mistrial.

Forewarning can also affect the quality of an opportunity to object. Where a judge or certain events place trial counsel on notice of an impending mistrial, counsel has a longer and more meaningful opportunity to object to a mistrial. *See DiPietro,* 936 F.2d at 11 ("Although the court did not explicitly notify counsel that it was considering a mistrial, the error and the fact that the court was considering how to deal with it were not surprises."); *Camden,* 892 F.2d at 618 ("Defense counsel should have anticipated the possibility of a mistrial and been prepared to object or suggest more acceptable alternatives when the trial judge announced the ruling."); *Puleo,* 817 F.2d at 705 (finding opportunity to object where the court placed defendant on notice prior to its mistrial declaration).

Applying the same logic, one should discount an opportunity to object where, as here, a trial court declares a mistrial unexpectedly. *See, e.g., Jorn,* 400 U.S. at 487, 91 S.Ct. at 558 ("[T]he trial judge acted so abruptly in discharging the jury that had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so."); *Gori v. United States,* 367 U.S. 364, 365 n. 6, 81 S.Ct. 1523, 1524 n. 6, 6 L.Ed.2d 901 (1961) (noting in dicta "petitioner's argument that, because of the precipitous course of events, there was no opportunity for [an] objection"); *Glover,* 950 F.2d at 1240 ("The summary nature of the trial court's actions, a swift declaration followed by the immediate dismissal of the jury and adjournment of the court, rendered an objection both unlikely and meaningless."); *United States v. Bates,* 917 F.2d 388, 393 (9th Cir.1990) (citing surprise as limiting defendant's opportunity to object to a *sua sponte* declared mistrial); *Lovinger v. Circuit Court,* 845 F.2d 739, 744–45 (7th Cir.) ("Defense counsel could not reasonably have been expected to interrupt the judge in the few moments between the surprise mistrial declaration and the judge's departure from the courtroom."), *cert. denied,* 488 U.S. 851, 109 S.Ct. 136, 102 L.Ed.2d 108 (1988). Judge Citta's unexpected tragedy and the ensuing pace of events rendered defense counsel less able to react with a timely and adequate objection. *See* Hearing Tr. at 52–55 (testimony of defense counsel) (recalling he did not think rationally until returning to his office); *id.* at 38 (testimony of petitioner) (describing the mistrial scene as confused).

The atmosphere of proceedings can also affect an opportunity to object. For example, where counsel's only opportunity to object would involve interrupting a judge's jury address or incurring the jury's wrath, counsel may understandably be somewhat reluctant to make a needed objection. *See, e.g., Camden,* 892 F.2d at 620 (Posner, J., dissenting) ("Counsel is naturally reluctant to risk antagonizing the jury by asking the judge to recall it and to risk antagonizing the judge by arguing with him in front of the jury."); *Russo,* 483 F.2d at 17 ("[T]o have objected in front of the jury might have prejudiced appellant for trying to 'show up' the trial judge, especially if some members of the jury actually did want to go home despite their civic obligation."); *see also Bates,* 917 F.2d at 393 n. 6 ("To [oppose a mistrial] in front of the jury might itself have created grounds for a mistrial, something we would not expect an attorney ... to do."). Similarly, although objecting to Judge Citta's mistrial declaration could have been accomplished with due care and respect, Judge Citta's grief and the

urgency of his familial obligations made such a feat considerably more difficult.

Approximately fifteen to twenty minutes passed between the tragic telephone call and Judge Citta's in-court mistrial declaration. *See* Hearing Tr. at 35, 54, 94. Standing alone, this figure constitutes a small but adequate window of time within which to object to the mistrial. Other features of the proceedings, however, detract from a finding of meaningful opportunity. In view of Judge Citta's unavailability to discuss the ruling with counsel, the unexpected nature of the mistrial declaration, and the somber atmosphere surrounding the proceedings, the Court concludes defense counsel had little meaningful opportunity to object to the mistrial.

### 2. Solicitation of Counsel's Views

Judicial invitation to object or comment on the prospect of a mistrial provides defense counsel with a prime opportunity with which to state a position. Silence in response to such an invitation suggests consent more so than silence standing alone. By placing silence in context, an invitation adds meaning to something that is ordinarily more ambiguous. *See United States v. Buljubasic,* 808 F.2d 1260, 1265–66 (7th Cir.) ("If a judge should say: 'I think a mistrial would be a good idea, but think this over and let me know if you disagree,' the defendant's silence would be assent."), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987); *cf.* Fed. R.Evid. 801(d)(2)(B) advisory committee's note (permitting courts to infer an adoptive admission from a defendant's silence in response to an accusation); William N. Eskridge, Jr., *Interpreting Legislative Inaction,* 87 Mich.L.Rev. 67, 69 (1988) (relating the "acquiescence rule" of statutory interpretation: "if Congress remains silent after a judicial or administrative interpretation of a statute by failing to overturn it, Congress probably acquiesces in the interpretation"). *See generally* Peter Tiersma, *The Language of Silence,* 48 Rutgers L.Rev. 1 (1995) (surveying the law for instances in which courts ascribe meaning to silence). Thus, where a court solicits views or invites comment, counsel's silence falls in a more meaningful context and imputing his consent is more justified.

In the case at bar, Judge Citta made no such solicitation of counsel. He did not discuss alternatives to a mistrial with them, seek their input, or otherwise invite their comments. Quite to the contrary, Judge Citta came to a decision, informed counsel of it, and instructed them to return to the courtroom as soon as possible. *See supra* note 3. Because Judge Citta did not invite comments on the prospect of a mistrial, counsel's silence remains ambiguous.

### 3. Awareness of the Issue

Where counsel is aware of the double jeopardy issue yet remains silent, he makes a deliberate, perhaps tactical decision not to raise an objection. Courts fairly impute consent to such calculated decisions. *See, e.g., Ham,* 58 F.3d at 84 & n. 4 (suspecting strategic reasons for not raising the double jeopardy issue and preventing defendant from profiting from such a strategy); *Camden,* 892 F.2d at 620 (Posner, J., dissenting) (noting a "concern with the strategic employment of silence" underlying some cases inferring implied consent); *see also United States v. Maybury,* 274 F.2d 899, 905 (2d Cir.1960) (Friendly, J.) (counseling against "convert[ing] the guarantee of double jeopardy from a shield into a sword"). Where, however, counsel is unaware of the double jeopardy issue, strategic use of the Double Jeopardy Clause is not such a concern. Moreover, although consent to a mistrial need not meet the "knowing, intelligent, and voluntary" standard set forth in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *see Dinitz,* 424 U.S. at 609 n. 11, 96 S.Ct. at 1080 n. 11, the Supreme Court's admonition, that courts should "indulge every reasonable presumption against the waiver of fundamental rights," *see Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942), suggests that courts should not lightly impute implied consent to unknowing silence.

The Court has found that defense counsel's failure to object to the mistrial was an innocent omission, not a calculated, tactical maneuver. *See* Hearing Tr. at 53–55 (testimony

of defense counsel) (recalling he was thinking not of the trial but rather of Judge Citta's tragedy and the recent passing of his own brother). Neither defense counsel, nor the prosecution, nor the trial court recognized the double jeopardy issue until after the mistrial was declared and the jury was dismissed. *See id.* at 14, 54–55, 87–88. Indeed, it was not until defense counsel returned to his office that he first considered the double jeopardy issue. *See id.* at 55.

### 4. Likelihood of Consent

If prior to a mistrial declaration, the proceedings have progressed in an accused's favor, he is less likely to consent to a mistrial. *See Lovinger,* 845 F.2d at 745 ("In light of the prosecution's [poor] performance, [petitioner] would not likely have chosen to assent to the mistrial declaration had he been given time to deliberate."); *Buljubasic,* 808 F.2d at 1266 (noting that where "things [are] going defendant's way ... an inference of assent from silence [is] implausible"); *see also Jorn,* 400 U.S. at 486, 91 S.Ct. at 558 (noting the Double Jeopardy Clause protects a defendant's right to a "verdict of a tribunal he might believe to be favorably disposed to his fate"). Prior to Judge Citta's mistrial declaration, the prosecutor's case against petitioner had encountered a few bumps in the road. Indeed, capitalizing on the mistrial, the prosecution endeavored to smooth these bumps during the retrial. The state did not call petitioner's arresting officer, whose testimony had been arguably impeached the previous day, and slightly expanded the testimony of another officer. *See supra* pp. 381–82; *cf. Washington,* 434 U.S. at 504 n. 14, 98 S.Ct. at 829–30 n. 14 (noting similar "subtle changes" by the government in successive prosecutions). Because there had only been a few hours of testimony before the mistrial was declared, it is difficult to assess in hindsight whether petitioner would have consented to a mistrial had he been squarely offered the opportunity to do so.[9] However, the prosecution felt its case needed a bit of improvement, and it is certainly plausible that petitioner would not want to give the government that opportunity.

### 5. Analysis

Weighing these factors, the Court will not infer consent from defense counsel's failure to object to Judge Citta's *sua sponte* mistrial declaration. Defense counsel had some small window of opportunity within which to object to Judge Citta's mistrial declaration. Fifteen or twenty minutes passed between Judge Citta's fateful telephone call and the mistrial declaration, most of which was spent in chambers and some of which was consumed by the conversation between Judges Citta and Braithwaite. Under the circumstances this small time frame was not conducive to rational thinking about legal matters. After deciding to mistry the case, Judge Citta instructed counsel to return to the courtroom, declared a mistrial, dismissed the jury, left the courtroom, and hastened home to comfort his grieving wife. The unexpected nature of the tragic events shocked everyone. It is neither fair nor rational to infer consent from an attorney's silence in this emotionally charged and tense atmosphere.

The remaining three factors further suggest this Court should not imply consent to defense counsel's silence. Upon learning of his mother-in-law's passing, Judge Citta's primary concern was to return home to his wife as quickly as possible. Because in his haste Judge Citta did not solicit input or argument from counsel, it is difficult to impute assent to a mistrial to defense counsel's silence. Neither defense counsel nor anybody else even considered the double jeopardy issue or the various alternatives that might have been available other than an immediate mistrial. In addition, given the problems encountered by the prosecution, it is hardly a foregone conclusion that defense counsel would have consented if asked.

While on different facts defense counsel's failure to object could constitute implied consent to a mistrial, the Court cannot imply consent on the record in this case. Accord-

---

**9.** At the evidentiary hearing, petitioner testified he perceived that the jury "didn't believe some of the testimony that was being given by the prosecutor's witnesses." *See* Hearing Tr. at 40. Given petitioner's interest in the outcome of this petition and the difficulties inherent in reading juries, the Court places little weight on petitioner's jury assessment.

ingly, the Court must now turn to the second phase of the double jeopardy analysis and determine whether "manifest necessity" warranted a mistrial.

## B. *Manifest Necessity*

■ Even absent his consent a defendant may be retried where, "taking all the circumstances into consideration, there is a manifest necessity for the [mistrial] or the ends of public justice would otherwise be defeated." *Perez*, 22 U.S. (9 Wheat.) at 580.[10] While a reviewing court should afford great deference to a trial judge's decision to mistry a case, this deference is not unlimited. *See Washington*, 434 U.S. at 514, 98 S.Ct. at 834–35 ("Our conclusion that a trial judge's decision to declare a mistrial ... is entitled to great deference does not, of course, end the inquiry."); *see also id.* at 507–10, 98 S.Ct. at 831–33 (affording more deference in mistrials involving hung juries or possible jury bias).

■ This Court has "an obligation to satisfy [itself] that, in the words of Mr. Justice Story, the trial judge exercised 'sound discretion in declaring a mistrial.'" *Id.* at 514, 98 S.Ct. at 835 (quoting *Perez*, 22 U.S. (9 Wheat.) at 580). This Court must thus reexamine the mistrial decision, first determining whether a trial judge rationally could conclude that manifest necessity compelled the declaration of a mistrial, *see Washington*, 434 U.S. at 514–16 & n. 34, 98 S.Ct. at 834–36 & n. 34 (reexamining facts to determine if manifest necessity warranted a mistrial); *Somerville*, 410 U.S. at 468–71, 93 S.Ct. at 1072–74 (same); *Downum v. United States*, 372 U.S. 734, 735–38, 83 S.Ct. 1033, 1033–36, 10 L.Ed.2d 100 (1963) (same); *Wade*, 336 U.S. at 691–92, 69 S.Ct. at 838–39 (same), and second considering whether the trial judge acted precipitately or whether he expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alter-

natives less drastic than declaring a mistrial. *See Washington*, 434 U.S. at 514–16, 98 S.Ct. at 834–36 (taking into account these considerations); *Jorn*, 400 U.S. at 486–87, 91 S.Ct. at 557–58 (same); *see also Gilliam v. Foster*, 75 F.3d 881, 901–02 (4th Cir.) (en banc) (treating these considerations as indicators that the trial judge exercised "sound discretion"), *cert. denied*, —— U.S. ——, 116 S.Ct. 1849, 134 L.Ed.2d 950 (1996); *cf. Bates*, 917 F.2d at 395–96 (asking whether the trial court "(1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chosen the alternative least harmful to a defendant's rights, (3) acted deliberately instead of abruptly, and (4) properly determined that the defendant would benefit from the declaration of a mistrial").

■ The manifest necessity standard is not to "be applied mechanically or without attention to the particular problem confronting the trial judge." *Washington*, 434 U.S. at 506, 98 S.Ct. at 830–31; *see also Somerville*, 410 U.S. at 467, 93 S.Ct. at 1072 (rejecting rigid categories supporting or failing to support a determination of manifest necessity). Nor should the words "manifest necessity" be read literally: "contrary to the teaching of Webster, ... there are degrees of necessity and ... a 'high degree' [is required] before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506, 98 S.Ct. at 831. Rather, the standard is a flexible one by which a court must balance the need to abort the trial with an accused's right not to be twice placed in jeopardy for the same offense. *See Somerville*, 410 U.S. at 462, 93 S.Ct. at 1069–70 (deeming manifest necessity a "flexible standard"); *Jorn*, 400 U.S. at 486, 91 S.Ct. at 558 ("[T]he judge must temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might

---

**10.** "Ends of public justice" is a term of art not applicable to the case at bar. *See Somerville*, 410 U.S. at 468–71, 93 S.Ct. at 1072–74 (holding that the "ends of public justice" serve to support a mistrial declaration when a defect is found rendering any conviction the government may ob-

tain subject to being "upset at will" on appeal or in collateral proceedings); *cf. Love*, 282 N.J.Super. at 599, 660 A.2d at 1251 (confusing "ends of public justice" with preventing petitioner from "escap[ing] justice").

believe favorably disposed to his fate.");
*United States v. Givens*, 88 F.3d 608, 613
(8th Cir.1996) ("Manifest. necessity ... is a
flexible standard that seeks fairness to the
defendant, the government, and the public
interest.").

Although a judge's inability to continue a trial as scheduled may, in some circumstances, render a mistrial declaration manifestly necessary, *see, e.g., Gori*, 367 U.S. at 372, 81 S.Ct. at 1528 (considering a mistrial warranted upon a "breakdown in judicial machinery such as happens when a judge is stricken") (Douglas, J., dissenting); *United States v. Lynch*, 598 F.2d 132 (D.C.Cir.1978) ("[I]llness of a judge is an exigency which may support the declaration of a mistrial and a finding of manifest necessity."), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979), such a conclusion does not necessarily follow. *See, e.g., United States v. Sartori*, 730 F.2d 973, 977 (4th Cir.1984) (finding viable alternatives to recusal and mistrial negated manifest necessity); *Lynch*, 598 F.2d at 135 (evaluating court efforts to substitute judges or otherwise avoid a mistrial). Where, as here, the court can effectively substitute another judge to complete the trial

as if that judge presided from its commencement, the necessity of a declaring a mistrial lessens considerably.[11] *Cf. Sartori*, 730 F.2d at 976 (deeming judge substitution preferable to recusal and mistrial and thus finding no manifest necessity). The necessity of declaring a mistrial similarly lessens where a court can adjourn and not dismiss its jury until the trial judge can return, or at least until the trial judge or a designee can reflect on the mistrial decision without intense time pressure and without precluding otherwise viable alternatives.[12] Thus, while Judge Citta's family emergency made it manifestly necessary to take some form of immediate action, it did not make it manifestly necessary to mistry the case.[13]

In the midst of the personal tragedy he was enduring it is fully understandable that a capable and skilled trial judge like Judge Citta would fail to consider the double jeopardy implications of his decision. His one and only overriding concern was to get home as quickly as possible to comfort his grieving wife. Knowing that home was more than an hour and a half away must have added to the pressure.

**11.** New Jersey Rule 1:12–3(b) envisions precisely such a procedure. Mirroring Federal Rule of Criminal Procedure 25(a), the New Jersey rule provides,

> If a judge is prevented during a trial from continuing to preside therein, another judge may be designated to complete the trial as if having presided from its commencement, provided, however, that the substituted judge is able to become familiar with the proceedings and all of the testimony therein through a *complete transcript thereof.*

When Judge Citta declared the mistrial, the proceedings had run only about three hours (transcribed to 122 pages). Particularly since Judge Alvarez sat in on some of the trial, she could have become familiar with the proceedings rather quickly and easily. *See supra* notes 4–5; *cf. Sartori*, 730 F.2d at 976 ("A mistrial was declared after only one day of the jury trial, and at that point a substitute judge could have become familiar with the case without great difficulty.").

**12.** So long as a trial judge admonishes the jury not to discuss the case, such a mid-trial recess passes constitutional muster. *See, e.g., Hamilton v. Vasquez*, 17 F.3d 1149, 1159 (9th Cir.) (preplanned two-week winter vacation), *cert. denied*, —— U.S. ——, 114 S.Ct. 2728, 129 L.Ed.2d 851 (1994); *United States v. Pandozzi*, 878 F.2d 1526, 1534 (1st Cir.1989) (one-week continuance

due to death of juror's father); *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir.1988) (four-day recess for Thanksgiving weekend), *cert. denied*, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). Moreover, since petitioner's trial had already begun, a recess would present no speedy trial problems. *See Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2191–94, 33 L.Ed.2d 101 (1972) (requiring trial to begin, not conclude, speedily).

**13.** In so holding, the Court agrees with much of the analysis of the Appellate Division's published opinion:

> If, because of personal reasons such as those involved here, the judge was unable to consider them, the matter should have been referred to another judge for such consideration. Any reasonable alternative should be contemplated before a mistrial is granted without defendant's express consent.... Unfortunately *no* effort was made prior to the mistrial to develop on the record the defendant's position, or that of the State, concerning continuation of the trial before another judge consent to a mistrial, carrying the trial until the trial judge could return, or some other alternative.

*Love*, 282 N.J.Super. at 598, 660 A.2d at 1251 (citations omitted).

Had Judge Citta or Judge Braithwaite realized the potential double jeopardy issue, they surely would have considered less drastic alternatives, including a recess of a one or two days to permit the meaningful involvement of counsel in decisions as to further proceedings. However, in that moment of grief, the court simply did not consider the double jeopardy consequences of an erroneous decision, *see* Hearing Tr. at 14 (testimony of Judge Citta) ("[Double jeopardy] never crossed my mind, no."), heard no argument on the appropriateness of such a measure, *see id.* at 18 (testimony of Judge Citta) (recalling he sought no input from counsel regarding the mistrial decision), and insufficiently considered measures less drastic than declaring a mistrial. *See id.* at 14 (testimony of Judge Citta) (conveying a cursory consideration of substituting judges and a failure to realize the instantly available Judge Alvarez); *Love,* 282 N.J.Super. at 598, 660 A.2d at 1251 (conceding Judge Citta's failure to consider reasonable alternatives); *see also Crawford v. Fenton,* 646 F.2d 810, 818 n. 9 (3d Cir.) ("The more obvious and adequate the alternative is, the greater the role it must play in the trial judge's discretionary determination of whether a manifest necessity exists to declare a mistrial."), *cert. denied,* 454 U.S. 872, 102 S.Ct. 344, 70 L.Ed.2d 178 (1981). Although Judges Citta and Braithwaite acted in good faith without any motive to improve the chances of petitioner's conviction at a subsequent trial, *see Love* 282 N.J.Super. at 599, 660 A.2d at 1251 (treating this point as dispositive),[14] their decision was not an exercise of sound discretion.[15]

This Court can only conclude that while the actions of Judges Citta and Braithwaite were understandable in human terms, there was no manifest necessity, in constitutional terms, to declare a mistrial and to deprive petitioner of his "valued right to have his trial completed by a particular tribunal." *Jorn,* 400 U.S. at 484, 91 S.Ct. at 557. The availability of several adequate, less drastic alternatives negates a finding of manifest necessity and compels this Court to conclude that petitioner's retrial following a mistrial violated the Double Jeopardy Clause of the United States Constitution.

## IV. STAY

The Court must now consider whether to stay the issuance of the writ of habeas corpus and delay petitioner's release pending an appeal to the Court of Appeals for the Third Circuit. *See* Fed.R.App.P. 23(c). In *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), the Supreme Court held that in considering the grant of a stay, a court may consider whether "the prisoner will pose a danger to the public if released." *Id.* at 777, 107 S.Ct. at 2119. The Court went on to note that

> [t]he State's interest in continuing custody and rehabilitation pending a final determination of the case on appeal is also a factor to be considered; it will be strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served.

*Id.*

Petitioner is at the early stages of a thirty-year sentence, and while his conviction may be constitutionally infirm, there is nothing in the record which suggests actual innocence of the armed robbery charge. Nor is this his first conviction. Petitioner admitted on cross examination that he had a prior conviction for murder. *See* Hearing Tr. at 41. On this record, the Court can only conclude that if released, petitioner would "pose a danger to

---

14. Properly stated, the manifest necessity inquiry is whether a trial judge acts within his sound discretion in declaring a mistrial, not whether he declares a mistrial in good or bad faith. *See Perez,* 22 U.S. (9 Wheat.) at 580. Thus, although a bad faith declaration of a mistrial may suggest an abuse of a trial judge's sound discretion, good faith is inconclusive of properly exercised discretion.

15. Upon later reflection, Judge Braithwaite testified that substituting Judge Alvarez for Judge Citta pursuant to New Jersey Rule 1:12–3(a) would not have been "appropriate," given some previously made rulings and Judge Alvarez's newness to the criminal bench. However, mere inconvenience or inappropriateness fall far short of the "high degree" of necessity that the manifest necessity standard demands. *See Washington,* 434 U.S. at 506, 98 S.Ct. at 830–31.

**392**

the public." *Hilton,* 481 U.S. at 777, 107 S.Ct. at 2119.

*Hilton* also suggests that in evaluating possible issuance of a stay a court should consider the government's likelihood of success on appeal. See *id.* at 778, 107 S.Ct. at 2120. The most troubling aspect of this case, whether defense counsel's silence amounted to consent to the mistrial, is not easy to resolve. Courts of Appeals around the country have varied in their approach to this issue. *See supra* notes 6–8. Nor can this Court ignore that a respected panel of the New Jersey Appellate Division reached a contrary conclusion. There is sparse relevant Third Circuit authority, and it is difficult to predict what approach that Court might take to the issues raised in this proceeding. The issuance of a stay will protect the public interest while allowing appellate review of an important constitutional issue.

## V.  CONCLUSION

The Court discharges its constitutional duty with full recognition that petitioner has been found guilty by a jury of the serious offense charged. While serious criminal conduct should not go unpunished, such a result is constitutionally mandated, albeit infrequently, to protect the right of all citizens not to be twice placed in jeopardy for the same offense—a right "that was dearly won and one that should continue to be highly valued." *Green,* 355 U.S. at 198, 78 S.Ct. at 229. Despite the heavy price that the vindication of constitutional liberties occasionally exacts on society, the Court is confident it is one worth paying for because the freedoms guaranteed in the Bills of Rights must be upheld in individual cases in order to be secured for the enjoyment of all. Accordingly, the Court concludes that since petitioner's first trial was terminated without his consent and without manifest necessity, the Double Jeopardy Clause bars his prosecution. Issuance of a writ of habeas corpus will be stayed pending appeal. An appropriate order will issue on even date herewith.